UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Brandon C. Dickson, | Case. No. 25-cv-4307-PAM/DTS |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| Jacob R. Spies, Richard L. Knoche, Kyle A. Pond, John K. Biederman, Aaron J. Pearson, Tony J. Partyka, Benjamin M. Bauer,  individually, and in their official capacity as Minneapolis police officers; the City of Minneapolis; Jason Wong and Jason Majeski, individually and in their official capacity as Hennepin County Sheriff deputies; and Hennepin County, | **Jury trial demanded** |
| Defendants. | |

Comes now, the Plaintiff, Brandon C. Dickson ("Plaintiff" or "Dickson") and as and for his Complaint against the Defendants, he states and alleges as follows:

**INTRODUCTION**

1.      This is an action for money damages and declaratory relief brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourth Amendments to the United States Constitution as made applicable to the states pursuant to the Fourteenth Amendment to the United States Constitution, and under the common and statutory law of the State of Minnesota, against Defendant officers, in their

1

individual and official capacities, and against the City of Minneapolis and Hennepin County.

2.      Like most if not all Black men driving in Minneapolis, Plaintiff has been repeatedly pulled over by law enforcement because he is Black, and then law enforcement has further subjected Plaintiff to invasions of his clearly established constitutional rights.

3.      This case involves two such instances, on about November 12, 2019, and August 7, 2020, respectively, when Defendants pursued Plaintiff for driving while Black.

4.      In each instance, Defendants seized, arrested, abused, and roughed up Plaintiff with no reasonable articulable suspicion, probable cause, or lawful justification to support their interference with Dickson's liberties, or use of force against Dickson.

5.      Defendants also proceeded, in each instance, to tear apart Dickson's vehicles, rifle through his personal effects and work materials, and those of his family, including four minor children, and otherwise conduct extensive searches which revealed no violations of the law.

6.      In each instance, Dickson was not charged with any crime.  Rather, as part of Defendants' standard course of targeting Black men, in defiance of the United States and Minnesota Constitutions, Defendants subjected Dickson to the humiliation and degradation which Defendants inflict upon Black men because

2

they are Black, especially upon Black men willing to speak up for themselves when treated as though they are not entitled to constitutional protection.

## **PARTIES**

7.      Dickson is, and was during the occurrences set forth in this Complaint, a resident of Minneapolis, Hennepin County, Minnesota.

8.      Dickson is a Black male, born June 9, 1989.

9.      Defendant Jacob R. Spies ("Spies") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Spies is a Minnesota resident.

10.     Defendant Richard L. Knoche ("Knoche") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Knoche is a Minnesota resident.

11.     Defendant Kyle A. Pond ("Pond") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Pond is a Minnesota resident.

12.     Defendant John K. Biederman ("Biederman") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Biederman is a Minnesota resident.

13.     Defendant Aaron J. Pearson ("Pearson") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Pearson is a Minnesota resident.

14.     Defendant Tony J. Partyka ("Partyka") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Partyka is a Minnesota resident.

15.     Defendant Benjamin M. Bauer ("Bauer") was, during the occurrences set forth in this Complaint, a police officer for the City of Minneapolis Police Department.  On information and belief, Bauer is a Minnesota resident.

16.     Defendant City of Minneapolis ("City") is a municipality in the State of Minnesota, and was, at the time of the relevant occurrences set forth in this Complaint, the employer of Defendant Minneapolis police officers.

17.     Defendant Jason Wong ("Wong") was, on information and belief, during the relevant occurrences set forth in this Complaint, a deputy of the Hennepin County Sheriff's department.  On information and belief, Wong is a Minnesota resident.

18.     Defendant Jason Majeski ("Majeski") was, on information and belief, during the relevant occurrences set forth in this Complaint, a deputy of the Hennepin County Sheriff's department.  On information and belief, Majeski is a Minnesota resident.

19.     Defendant Hennepin County ("County") is a political subdivision and county of the State of Minnesota, and was, at the time of the relevant occurrences set forth in this Complaint, the employer of Wong and Majeski.

## ALLEGATIONS COMMON TO ALL COUNTS

20.     At all times material Dickson was unarmed.

4

21.    At all times material, Dickson posed no threat of injury to anyone.

22.    At all times material, Dickson had not committed a felony.

23.    At all times material, Dickson had not committed a gross misdemeanor.

24.    At all times material, Dickson had not committed a misdemeanor.

25.    At all times material, Dickson had not committed a petty misdemeanor.

26.    On about November 12, 2019, Dickson was driving in North Minneapolis, where he resides, to a Walgreens on Broadway Avenue.

27.    On information and belief, Defendants Knoche and Spies were on patrol, including for the purpose of identifying Black men to stop without probable cause, reasonable articulable suspicion, or other lawful justification.

28.    At all times, Dickson was following all traffic laws.

29.    Dickson passed Knoche and Spies, travelling at a lawful speed, and Knoche and Spies then started following Dickson.

30.    After Dickson lawfully signaled his turn into the Walgreens parking lot, and as Dickson was parking and about to exit his vehicle to enter Walgreens, Spies and Knoche activated their squad lights.

31.    At the same time, Dickson, who had no reason to believe that there was any lawful reason to be stopped by police, slowly exited his parked car to enter Walgreens.

32.    At this point, and at all times material, neither Spies nor Knoche had reasonable articulable suspicion or probable cause to detain Dickson.

33.    Spies and Knoche ordered Dickson to put his hands on the car, and Dickson complied.

34.    At least by this point, Defendants had seized Dickson within the meaning of the Fourth Amendment and that seizure continued until he was eventually released nearly 20 minutes later.

35.    Spies and Knoche then quickly escalated the situation, ordered Dickson to put his hands behind his back, falsely accused him of "tensing," forcefully put him into handcuffs, which were overly tight, pushed him, shoved him, choked him, and lied about what Dickson was doing in an attempt to justify their increased escalation, including Knoche holding his forearm to Dickson's neck and pushing his head down, for approximately two minutes, while Dickson was cuffed.

36.    Dickson verbally protested about how he was being treated by Spies and Knoche, but Spies and Knoche only then escalated their use of force against Dickson.

37.    On information and belief, Minneapolis police officers are trained to claim that individuals "tense up" as a justification for use of force, and Defendants Knoche and Spies quickly alleged that Dickson was "tensing" with the intent to escalate their use of force, without legitimate justification.

38.    Spies and Knoche eventually pushed Dickson into the back of the squad.

39.     As Dickson sat in the back of the squad, cuffed behind the back, and complained that the stop was not justified, and that he was being mistreated, Spies taunted him and made up a series of false claims as to why Dickson had been stopped and detained.

40.     When a Black police officer, Tyrone Barze, arrived on the scene, in a second squad, and Dickson expressed to Spies that he preferred to talk with Barze, Spies taunted Dickson and told Dickson "You've never talked to him. That's racist." Spies continued, "You just see a person of color and you identify with them automatically?" When Dickson said "Absolutely," Spies continued, telling Dickson "That's racist, sir, that is racist, that is racist, sir, that is the most ignorant and racist thing I have ever heard." As Spies continued to taunt Dickson, he told Dickson that Dickson was "the most racist individual [Spies had] encountered in a long time."

41.     As Spies continued to escalate the situation, and threatened to tow Dickson's vehicle, Dickson started to say, "At this point brother," at which point Spies cut him off and said, in reference to Dickson calling him "brother," that "Now you are using more racial slurs against me."

42.     Taking the position that the stop was lawful, Spies described his interpretation of how he was able to treat Dickson at that time: "You don't get to just go do what you want. Your freedom of movement is over, sir. . . . You do not have any freedom anymore."

43.     Dickson had a right, protected by the First Amendment to the United States Constitution as made applicable to the States by the Fourteenth Amendment to the United States Constitution, to say what he said at all times material to this Complaint.  Defendants Spies and Knoche retaliated against Dickson for exercising his protected rights.

44.     While Dickson was detained in the squad, in cuffs, Knoche searched Dickson's vehicle for over five minutes, pulling apart the dashboard vents, rifling through the center console, and exceeding the scope of any permissible search.

45.     Even though the matter was code 4 prior to arrival of a third squad,[1] Defendant Pond, upon arrival, assisted with the search of the vehicle, from the passenger side, pulling at the dashboard panels, digging under the passenger seat, pounding on the roof and inside of the car in an effort to search for hidden compartments, and when through those efforts part of the car fell apart, Pond remarked "he's obviously hid something up there before," which was false.

46.     After nearly three minutes of not finding anything, and despite Knoche and Pond almost entirely dismantling the dashboard, as well as extensively searching other areas of the vehicle, Pond stopped assisting and Knoche continued his search, including of the rear seat from the driver's side.  Knoche's initial search exceeded four minutes.  He then returned to continue searching the

---

[1] Another Officer, Felix Alvarado, arrived with Defendant Pond but did not engage in the search of the vehicle with Pond and Knoche.

rear passenger side of vehicle, tugging at the upholstery for another approximate minute.

47.     Defendants Spies and Knoche continued to detain Dickson long after they had confirmed that Dickson was the registered owner of his vehicle, and without any intention of charging him with any crime, leaving him in overly tight cuffs for approximately 18 minutes.

48.     On information and belief, Spies and Knoche filed false police reports to cover up their actions and claimed that Dickson's windows were illegally tinted without even attempting to test the front windows.

49.     No charges ever were pending against Dickson related to the facts set forth above.

50.     Dickson was released after being detained for nearly 20 minutes.

51.     At the time of the November 19, 2019 incident, Dickson was signed up for a class to study for his contractor's license, with Kaplan.  Dickson was so shaken by the November 12, 2019 incident, that he could not focus to finish the course.  It took until October 2025 for Dickson to regroup and take the exam so that he now is a licensed contractor.

52.     On about August 8, 2020, less than three months after George Floyd was murdered by Minneapolis police, Dickson was driving near the Minnesota Twins stadium, Target Field, in downtown Minneapolis.

53.     On information and belief, Defendants Wong and Majeski were on patrol, including for the purpose of identifying Black men to stop without probable cause, reasonable articulable suspicion, or other lawful justification.

54.     At all times, Dickson was following all traffic laws.

55.     Wong and Majeski stopped Dickson and ordered him from the car.  At least by this point, Defendants Wong and Majeski had seized Dickson within the meaning of the Fourth Amendment and that seizure continued until he was eventually released.

56.     Dickson, fearful for his life, asked why he was being asked to exit the vehicle.  Wong and Majeski told Dickson to shut up and began disrespecting and belittling him.

57.     After searching Dickson and finding no contraband or threats to safety, and with no reason to detain Dickson, Wong pulled out cuffs and started to cuff Dickson.   When Dickson protested being put in cuffs, and while being surrounded by arriving officers Pearson, Biederman, Bauer, and Partyka,[2] Wong slammed Dickson into the side of the sheriff's squad, eventually forcing him into the back of the sheriff squad, while cuffed, with the forceful assistance of Biederman, Partyka, Majeski, and Pearson, all of whom pushed or pulled on Dickson while cuffed.

---

[2] Felix Alvarado also arrived with Partyka but, on information and belief, stood to the side and did not actively assist with detaining Dickson or searching Dickson's vehicle.

58.     Dickson protested that he was being unreasonably and improperly detained, and the Defendant officers only then escalated their rough treatment of Dickson.

59.     At one point, as Defendants pushed Dickson into the back of the squad, Dickson's cuffs were stuck on the squad seat, and Wong used his leg and pushed on Dickson even though he was stuck.  Dickson pleaded that his cuffs were stuck on  the seat, and only then did an officer untangle the cuffs to allow Dickson to get into the back of the squad where he was being pushed and pulled.

60.     Once Dickson was placed into the sheriff's squad, Defendants Wong, Partyka, Bauer, and Biederman joined Majeski, who had already started searching Dickson's vehicle, a search which lasted over six minutes, and included searching some areas multiple times, searching through the console, throwing Dickson's family's belongings around the vehicle, tugging at upholstery, lifting up the rear seats, popping the hood and searching through the engine cavity and tugging at components in said cavity, opening the rear of the vehicle full of Dickson's work supplies, digging under the seats, throwing child car seats on the floor, tugging at the dashboard, rifling through consoles, taking a knife to pry out components of the dashboard and console, attempting to dismantle the glove box, and exceeding the scope of any permissible search.

61.     At one point, one Defendant, on information and belief, Biederman, remarks "just because we didn't find it doesn't mean it isn't in there."

11

62.     Dickson had a right, protected by the First Amendment to the United States Constitution as made applicable to the States by the Fourteenth Amendment to the United States Constitution, to say what he said at all times material to this Complaint.   Defendants Wong, Majeski, Biederman, Bauer, Partyka, and Pearson retaliated against Dickson for exercising his protected rights.

63.     Defendants Wong, Majeski, Biederman, Partyka, Pearson and Bauer continued to detain Dickson long after they had confirmed that Dickson was not subject to seizure, and without any intention of charging him with any crime, leaving him in overly tight cuffs until he was released.

64.     No charges ever were pending against Dickson related to the facts set forth above.

65.     On information and belief, Dickson was detained in cuffs for ten minutes or more.

**COUNT I (Violation of 42 U.S.C. § 1983 - Unreasonable Search and Seizure)**

66.     Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

67.     By their actions, Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, under color of state law, violated and deprived Dickson of his clearly established and well-settled civil rights to be free from unreasonable search and seizure.

68.     Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson and Bauer subjected Dickson to this deprivation of his rights

12

either maliciously or by acting with reckless disregard for whether Dickson's rights would be violated by their actions.

69.    As a direct and proximate result of the acts and omissions of Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, Dickson suffered permanent injury, was forced to endure and will in the future suffer great bodily and mental harm, and was thereby damaged in an amount to be proved at trial.

### COUNT II (Violation of 42 U.S.C. § 1983 - Retaliation)

70.    Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

71.    Dickson engaged in activity protected by the First Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment to the United States Constitution, when he spoke to the Defendants and otherwise as set forth above.  Dickson's right to exercise his First Amendment freedoms without facing retaliation is clearly established.

72.    Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer retaliated against Dickson, which would chill a person of ordinary firmness from continuing in that activity.

73.    Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer's retaliation was unjustified and substantially motivated by Dickson's exercise of his clearly established rights under the First Amendment.

74. As a direct and proximate result of the acts and omissions of Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, Dickson suffered permanent injury, was forced to endure and will in the future suffer great bodily and mental harm, and was thereby damaged in an amount to be proved at trial.

## COUNT III (Violation of 42 U.S.C. § 1983 - Excessive Force)

75. Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

76. By their actions, Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, under color of state law, violated and deprived Dickson of his clearly established and well-settled civil rights to be free from excessive force.

77. Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer subjected Dickson to this deprivation of his rights either maliciously or by acting with reckless disregard for whether Dickson's rights would be violated by their actions.

78. As a direct and proximate result of the acts and omissions of Defendants Spies, Knoche, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, Dickson suffered permanent injury, was forced to endure and will in the future suffer great bodily and mental harm, and was thereby damaged in an amount to be proved at trial.

14

## COUNT IV (Conspiracy)

79.    Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

80.    Defendants Spies, Knoche, and Pond, with respect to the November 2019 incident, and Defendants Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, with respect to the August 2020 incident, conspired with one another to deprive Dickson of his constitutional rights as described herein.

81.    As a direct and proximate result of the acts and omissions of Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, Dickson suffered permanent injury, was forced to endure and will in the future suffer great bodily and mental harm, and was thereby damaged in an amount to be proved at trial.

82.    Defendants Spies, Knoche, and Pond, on the one hand, and Defendants Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, on the other, are jointly and severally liable for all damages caused to Dickson set forth herein, with respect to the November 2019, and August 2020 incidents, respectfully.

## COUNT V (Respondeat Superior/Vicarious Liability)

83.    Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

84.    Pursuant to Minn. Stat. § 466.02, as well as the doctrine of respondeat superior as the employer of the individual defendants, the City and County are

15

liable for the acts of Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer set forth herein.

## COUNT VI (Monell Claim)

85.     Dickson incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

86.     On information and belief, Defendants City and County have failed to properly train, supervise and/or discipline Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer. The unconstitutional and illegal actions of Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer were carried out pursuant to an unconstitutional policy, procedure or practice of the City and County, as executed by Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, in violation of Dickson's constitutional rights.

87.     On information and belief, the unconstitutional policies of the Defendants included the policy, custom, and procedure of failing to train officers to engage in safe and well-established procedures when making an arrest, or deciding when to pursue and make an arrest, and resulted in the violation of Dickson's constitutional rights.

88.     As a direct and proximate result of the negligent, intentional, or unconstitutional policies of the City and County, Dickson suffered and will suffer damages in an amount to be proved at trial.

16

## PRAYER FOR RELIEF

WHEREFORE,  Dickson prays for judgment against Defendants, and each of them, as follows:

A.    Declaring and adjudging the Defendants violated the laws as complained of herein;

B.    Awarding damages to Dickson in an amount as will be proved at trial, together with prejudgment interest;

C.    Awarding Dickson his costs, disbursements, and reasonable attorney's fees;

D.    Prohibiting Defendants from engaging in profiling of Black men, and requiring that Defendants institute training and policies to protect against continued profiling of Black men;

E.    Requiring all Defendants to issue an apology to Dickson;

F.    For such further and additional relief as may be just and equitable; and

G.    For a jury trial, which is hereby demanded.

**FERDINAND F. PETERS, ESQ. LAW FIRM**

Dated:  December 23, 2025

By:  ___ s/ Benjamin Loetscher
Benjamin Loetscher (#0389037)
711 Smith Ave. S.
St. Paul, MN  55107
Telephone:  (651) 647-6250
Fax:  (651) 560-7022
bloetscher@ferdlaw.com
**Attorneys for Plaintiff**

17