**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Brandon C. Dickson,<br><br>                          Plaintiff, | Case No. 25-cv-4307 (PAM/DTS) |
| vs.<br><br>Jacob R. Spies, Richard L. Knoche, Kyle A. Pond, John K. Biederman, Benjamin M. Bauer, individually, and in their official capacity as Minneapolis police officers; the City of Minneapolis; Jason Wong and Jason Majeski, individually and in their official capacity as Hennepin County Sheriff deputies; and Hennepin County,<br><br>                          Defendants. | **HENNEPIN DEFENDANTS'**<br>**MEMORANDUM OF LAW**<br>**IN SUPPORT OF**<br>**MOTION TO DISMISS** |

**INTRODUCTION**

Plaintiff Brandon C. Dickson ("Dickson") brings this lawsuit against Hennepin County along with Hennepin County Sheriff's deputies Jason Wong and Jason Majeski (together, "Hennepin Defendants"), as well as five Minneapolis Police Officers and the City of Minneapolis, (together, "Minneapolis Defendants"). In his First Amended Complaint ("Complaint"), Dickson claims that on November 12, 2019, and August 8, 2020, Defendants conspired to violate his constitutional rights by conducting unreasonable searches and seizures, retaliating against him, and using excessive force. Aside from general allegations made against "Defendants" without purposeful distinction between the Hennepin Defendants and Minneapolis Defendants, the Hennepin Defendants are only alleged to have been involved in events on August 8, 2020.

1

As relevant to the Hennepin Defendants, Dickson claims that on August 8, 2020, he was subjected to a traffic stop unsupported by probable cause, made to fear for his life, told to shut up, belittled, slammed into side of a sheriff's deputy squad car, and held in a sheriff's deputy squad car while his truck was searched. But Dickson's account of events is contradicted by body worn camera video (including video Dickson ostensibly had access to before filing his Complaint). That body worn camera video shows Dickson was stopped for an unilluminated taillight, and asked to step out of his truck after he admitted he did not have insurance. Dickson was then briefly patted down while contradicting himself regarding the possible presence of a weapon and handcuffed only after becoming increasingly agitated and refusing to calm down.

Dickson has not plausibly alleged any fact that is both consistent with the body worn camera footage and remains capable of supporting his claims for unreasonable search and seizure, First Amendment retaliation, excessive force, the existence of an unconstitutional policy of Hennepin County, or conspiratorial meeting of the minds relevant to or including Hennepin Defendants. Dickson's claims are further barred by qualified immunity where he has not plausibly alleged, and the body worn camera footage does not show, government conduct that shocks the conscience or otherwise willfully violated his clearly established rights. The Court should dismiss all of Dickson's claims against the Hennepin Defendants.

**ALLEGATIONS AND MATERIALS EMBRACED BY THE COMPLAINT[1]**

Dickson alleges that "Defendants pursued Plaintiff for driving while Black" in two separate incidents "on about November 12, 2019, and August 7, 2020, respectively." (First Am. Compl. [Compl.] ¶ 3, ECF 11.) According to Dickson, on both dates, "Defendants seized, arrested, abused, and roughed up" Dickson without lawful justification. (*Id.* at ¶ 4.) Dickson claims "Defendants" on both dates "conduct[ed] extensive searches which revealed no violations of the law" that he believes were part of an unlawful "standard course of targeting Black men." (*Id.* at ¶¶ 5-6.) Dickson asserts that "[a]t all times material" he was "unarmed," "posed no threat of injury to anyone," and had not committed any crime. (*Id.* at ¶ 20-25.)

Dickson's account of the incident on November 12, 2019, raises no allegations against the Hennepin Defendants. (*See generally id.* at ¶¶ 26-51.)

*Dickson's Account of Events on August 8, 2020*

On August 8, 2020, Dickson alleges he was driving near the Target Field stadium in downtown Minneapolis. (*Id.* at ¶ 52.) Dickson then asserts "[o]n information and belief, [Hennepin] Defendants [Deputy Jason] Wong and [Deputy Jason] Majeski were on patrol . . . for the purpose of identifying Black men to stop without probable cause, reasonable articulable suspicion, or other lawful justification." (*Id.* at ¶ 53.) Dickson provides no factual basis for this assertion. (*See generally id.*) Dickson further alleges that "[a]t all times, [he] was following all traffic laws." (*Id.* at ¶ 54.)

---

[1]     The allegations in the Complaint are taken as true only for the purposes of the instant motion but remain unproven—and unadmitted—allegations provided only for reference.

After the truck stopped, Wong asked Dickson to exit his truck. (*Id.* at ¶ 55.) Dickson claims he feared for his life, inquired why he was being asked to exit his truck, and was told to "shut up," before being disrespected and belittled. (*Id.* at ¶ 56.) After exiting, Dickson claims Wong searched his person, that "no contraband or threats to safety" were found during that search, and that Wong "slammed" Dickson into the squad car while handcuffing Dickson. (*Id.* at ¶ 57.) Dickson alleges unspecified officers "escalated their rough treatment" in response to his protests, that he got stuck while being placed in the back of the squad car, and that his truck was unreasonably searched. (*Id.* at ¶¶ 58-60.)

Dickson does not allege that he was arrested, charged, or cited during this incident. (*See id.* at ¶ 64.) Dickson does not allege concrete injury. (*Id.* at ¶¶ 69, 74, 76, 81) (generally alleging unspecified "permanent injury" and "great bodily and mental harm."). Dickson does not allege specific conduct by Hennepin County, other than employing and supervising Wong and Majeski. (*Id.* at ¶ 19.)

*Recorded Events on August 8, 2020, per Body Worn Camera Footage*

Wong and Majeski recorded the August 8, 2020, incident with their body-worn cameras. (Messerli Decl. ¶ 2, Ex. 1 Body-Worn Camera Video recorded on August 8, 2020, by Hennepin County Sheriff's Deputy Jason Wong. ["Wong BC"]; Messerli Decl. ¶ 3, Ex. 2 Body-Worn Camera Video recorded on August 8, 2020, by Hennepin County Sheriff's Deputy Jason Wong. ["Majeski BC"].)[2]

---

[2]    Citations to specific times in body-worn camera footage reference the timestamp in the top right corner of the video. Each body-worn camera video begins with a silent 60-second "lookback" period prior to the deputy initiating the recording; after the deputy initiates the recording, the footage contains both video and audio.

A.  <u>Wong and Majeski pulled Dickson over for traffic violations.</u>

Around four and a half minutes past midnight on August 8, 2020, Wong and Majeski turned on their body-worn cameras as Wong activated the squad car's emergency lights in order to initiate the Dickson traffic stop. (Wong BC 04:28; Majeski BC 04:30.)[3] Moments later, Majeski exited the squad car. (Wong BC 04:40-48; Majeski BC 04:42-50.) As Wong called in the stop, Majeski approached the passenger side window of Dickson's truck. (Wong BC 04:49-59; Majeski BC 04:51-05:01.) Dickson's upper right and center taillights were both visibly unilluminated at this time, and no rear license plate is visible on the truck in the recording. (Majeski BC 04:49-57.)

Wong called in the stop and exited the squad car. (Wong BC 04:49-05:09.) At the same time, Majeski tapped on the passenger side window and initiated conversation with Dickson. (Majeski BC 05:01-5:11.) While Wong approached the driver's side window, Majeski asked Dickson how he was, if he had a license, and if he would be willing to produce his license, which Dickson did. (Wong BC 05:09-19; Majeski BC 05:11-5:21.) Dickson stated that he "just bought the car a couple days ago." (Wong BC 05:19-25; Majeski BC 05:21-27.)

Wong then informed Dickson that he had "some taillights out," which Dickson disputed. (Wong BC 05:25-39; Majeski BC 05:27-41.) Wong then asked Dickson if Dickson had insurance on the truck yet; Dickson said he did not. (Wong BC 05:40-05:48; Majeski BC 05:42-05:50.) Wong then asked Dickson if he had a title, or "anything with

---

[3]    The time stamp on Wong's body-worn camera video appears to be approximately two seconds ahead of the timestamp on Majeski's body-worn camera video.

the VIN on it," Dickson said he did not. (Wong BC 05:48-58; Majeski BC 05:42-06:00.) When asked where he was going, Dickson said he was headed home and confirmed his address. (Wong BC 05:58-06:06; Majeski BC 06:00-06:08.)

    B.  <u>Wong searched Dickson for concealed weapons and briefly detained him.</u>

Wong asked Dickson to exit his truck, and Dickson complied. (Wong BC 06:06-14; Majeski BC 06:08-16.). Wong told Dickson he was not under arrest and that he had asked him to exit the truck for safety. (Wong BC 06:06-14; Majeski BC 06:08-16.) Wong asked Dickson to place his hands on the truck and conducted a limited pat search while Majeski confirmed Dickson was the only occupant of the truck. (Wong BC 06:14-35; Majeski BC 06:16-37.) During the search, Wong asked Dickson if he carried any weapons; at first, Dickson said he did not. (Wong BC 06:14-19.) Dickson then corrected himself to say he might have a knife, possibly a carpenter's knife, to which Wong noted "well that's a weapon, man" and asked where the knife would be while continuing the pat search. (Wong BC 06:20-28; Majeski BC 06:22-6:30.) After Dickson was unable to provide an answer where the knife would be, Wong produced a set of handcuffs. (Wong BC 06:30-6:35; Majeski BC 06:32-6:37.)

Dickson questioned why he might be handcuffed and told Wong he would "freak out" if put in handcuffs. (Wong BC 06:35-46; Majeski BC 06:37-48.) Dickson stated that he had "done nothing wrong" and that he had had bad experiences with law enforcement. (Wong BC 06:46-59; Majeski BC 06:48-07:01.) Deputy Wong acknowledged Dickson's comments before asking him to walk with him to the squad car, Dickson agreed. (Wong BC 07:00-05.) Dickson then reiterated that he did not want to be in handcuffs or to be

6

placed in the back of a squad car and became increasingly agitated as they approached the squad car, raising his voice such that it can be heard on Majeksi's body-worn camera. (Wong BC 07:06-07:16; Majeski BC 07:19-26.) Wong asked Dickson to "stop" twice, then pressed him against the squad car and asked him a third time. (Wong BC 07:16-21.) Wong then restrained Dickson and handcuffed him. (*Id.* at 07:21-36.) During this interaction, Majeski opened the passenger door and briefly inspected the passenger side of the truck, watched Dickson get handcuffed, and then walked to the driver's side of Dickson's truck. (Majeski BC 06:55-07:38.)

At this time, Wong attempted to put Dickson in the back of the Hennepin County squad car. (Wong BC 07:36-40.) Dickson asked why he was handcuffed. (*Id.*) Wong told Dickson to "get in" to the back of the car, before Dickson, still yelling, stated that his handcuffs had become stuck on the seat. (*Id.* at 07:40-48.) Wong is the only law enforcement officer that appears to touch Dickson between the time when the rear squad car door is opened while Dickson is handcuffed and the time Dickson's handcuff is released from being stuck on the seat. (*Id.* at 07:36-07:50.) Wong then helped Dickson into the squad car. (*Id.* at 07:48-59.) Wong expressed exasperation, before moving back toward Dickson's truck. (*Id.* at 07:59-8:36.)

C. <u>Majeski searches Dickson's truck while Wong confirms Dickson's documents.</u>

During this time, Majeski checked the driver's side of the truck, looked inside the center console, and under the center tray, before returning Dickson's property to the center console. (Majeski BC 07:38-08:30.)

Wong and Majeski then briefly checked under the hood of the truck. (Wong BC 08:36-09:02; Majeski BC 08:38-44.) Majeski walked back around the truck on the driver's side, observing a Minneapolis Police Department Officer conducting an additional search of the center console and tray. (Majeski BC 08:44-09:08.) Majeski then visually inspected the backseat of the truck, without disturbing any contents, before closing the rear driver's side door. (*Id.* at 09:08-15.) Majeski walked around the truck while Minneapolis Police Officers searched the car, before reconnecting with Wong. (*Id.* at 09:16-48.) Meanwhile, Wong had returned to his squad car and realized he did not have Dickson's ID. (Wong BC 09:02-09:33.)

Wong returned to Dickson's truck to ask if anyone happened to see Dickson's ID fall on the ground, and Majeski began looking for the ID. (Wong BC 09:33-10:10; Majeski BC 09:48-10:12.) A Minneapolis Police Officer told Wong they had placed Dickson's ID on Wong's laptop in the squad car. (Wong BC 10:10-20.) Meanwhile, Majeski located a second ID in Dickson's wallet and walked it to Wong. (Majeski BC 10:27-11:00.) Wong verified the IDs matched before asking Majeski to photograph the VIN on Dickson's truck, which Majeski did. (Wong BC 10:57-11:47; Majeski BC 10:59-11:49.) Majeski then returned to Dickson's truck, placed Dickson's IDs with his wallet in the center console, and shortly thereafter ended his body-worn camera recording. (Majeski BC 11:49-12:49.) Wong spent this time in the squad car with Dickson checking the VIN for Dickson's truck. (Wong BC 11:47-15:47.)

8

D.  <u>After nine minutes, Dickson is released.</u>

Once the VIN search came back clear, Wong exited the squad car and Majeski helped Dickson out. (*Id.* at 15:47.) Dickson recounted that he had "been beaten by the Minneapolis Police before" while Wong released him from handcuffs. (*Id.* at 15:47-16:16.)

After Dickson was released from handcuffs, he stayed to speak with Wong and Majeski. (*Id.* at 16:16-22:26.) Majeski said that he had thought Dickson told Wong he "had weed in his pocket." (*Id.* 16:34-44.) The three also discussed violence in the area— including gunshots which left bullet holes in Dickson's home and other two cars, as well as Dickson's prior experience(s) with law enforcement. (*Id.* at 16:16-22:26.) Dickson acknowledged his brake lights were, in fact, out. (*Id.* at 19:23-25; 20:06-14.)

During this conversation, Dickson did not claim to be hurt, display physical discomfort, or request medical assistance. (*Id.*) When asked by Majeski if he "had a bad experience here," Dickson laughed, made a small pinching gesture with his left hand, and said "I feel like I shouldn't have been cuffed, that's all, that's the only thing I feel . . . I feel like I shouldn't have been cuffed." (*Id.* at 19:43-51.) As the conversation wound down, Dickson told Wong and Majeski "I don't think y'all bad," Wong told Dickson to take care of his brake lights, and Dickson gave Wong a fist-bump before saying "y'all were nice" and walking away. (*Id.* at 21:52-22:21.)

At most, the entire August 8, 2020, interaction lasted a total of eighteen minutes. (*Id.* at 04:28-22:26.) Dickson was stopped just over three minutes and restrained in handcuffs for fewer than nine. (*Id.* at 04:28-7:30; 07:30-16:14.) For the remaining time, Dickson voluntarily engaged Wong and Majeski in friendly conversation. (*Id.* at 16:14-

22:26.) Video of the incident shows no apparent injury to Dickson, or any statement made by him consistent with a claim of such injury. (*Id.* at 04:28-22:26.)

*Procedural history*

The operative Complaint purports to raise six claims. (Compl., ECF 11, Dec. 23, 2025.) All claims derive from three asserted constitutional violations brought under 42 U.S.C. § 1983: unreasonable search and seizure (Count I), First Amendment retaliation (Count II), and excessive force (Count III). Dickson also claims conspiracy (Count IV); respondeat superior / vicarious liability via Minn. Stat. § 466.02 and Minnesota common law (Count V); as well as municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (Count VI) (Compl. at ¶¶ 66-88.)

Dickson seeks declaratory relief, damages, reasonable attorney's fees and costs, and an injunction "[p]rohibiting Defendants from engaging in profiling of Black men, and requiring that Defendants institute training and policies to protect against continued profiling of Black men" and "[r]equiring all Defendants to issue an apology to Dickson." (*Id.* at 17.)

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting the foregoing in relevant part); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (same). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept a complaint's well-pleaded factual allegations as true and draw all reasonable inferences in

10

the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The factual allegations must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

On a motion to dismiss, the court is generally "strictly limited to the four corners of complaints," but may consider "matters incorporated by reference or integral to the claim." *Dittmer Props., L.P. v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013) (citation modified); *see Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (explaining that consideration of matters outside the pleadings or evidence in opposition to the pleadings generally converts a Rule 12(b)(6) motion into one for summary judgment).

In analyzing a complaint's sufficiency, a court need not "adopt the plaintiff's version of the facts if they are blatantly contradicted by video evidence." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (internal quotation marks omitted). Relatedly, "[v]ideos of an incident are necessarily embraced by the pleadings." *Ching as Tr. for Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) (concerning body-worn camera footage, citing *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021)); *Waters v. Madson*, No. CV 17-935 (PAM/SER), 2017 WL 6403099, at *1 (D. Minn. Dec. 14, 2017), *aff'd*, 921 F.3d 725 (8th Cir. 2019) ("The Court may consider these recordings because they are necessarily embraced by the pleadings"). Nor must courts accept legal conclusions as true. *Iqbal*, 556 U.S. at 678.

11

### ARGUMENT

**1.    Dickson Fails to State a Plausible § 1983 Claim Against Wong and Majeski.**

The Complaint alleges three § 1983 claims against Wong and Majeski (without differentiation): unreasonable search and seizure, first amendment retaliation, and excessive force. In essence, these three claims challenge the authority, motivation, and manner of their conduct, respectively. Hennepin Defendants' conduct on August 8, 2020, as alleged and recorded, was authorized by at least arguable probable cause where Dickson had committed at least one admitted traffic violation, was not motivated by retaliatory animus where any adverse action Dickson complains of was unrelated to any protected speech, and was performed in a reasonable manner where the Complaint provides no plausible basis for finding their use of force was unreasonable. Hennepin Defendants' motion focuses on events of August 8, 2020, as no factual allegations found in the Complaint plausibly allege their involvement in the incident on November 12, 2019.

A.  Dickson's Claim for Unreasonable Search and Seizure Fails.

Dickson claims that Wong and Majeski violated his right to be free of "unreasonable search and seizure," without elaboration. (Compl. at ¶ 67.) As with all of Dickson's § 1983 claims, no specific conduct is identified as violative of these rights. (*See generally id.* at ¶¶ 66-78.) Indeed, Dickson makes no attempt to identify the nature of the supposed violation or violations:

> By their actions, Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer, under color of state law, violated and deprived Dickson of his clearly established and well-settled civil rights to be free from unreasonable search and seizure.

(*Id.* at ¶ 67.) Such "shotgun" pleadings shift the burden of deciphering Plaintiff's theory onto Defendants and the Court, but such work "is emphatically not the job of either a defendant or the Court." *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011) (J. Schiltz) (noting that it is "plaintiff['s] burden, under both Rule 8 and Rule 11, to reasonably investigate their claims, to research the relevant law, to plead only viable claims, and to plead those claims concisely and clearly, so that a defendant can readily respond to them and a court can readily resolve them"). This is alone, sufficient reason to dismiss this claim. *Id.* at 1154.

The allegations of the Complaint do not otherwise support a Fourth Amendment violation by either Wong or Majeski. As discussed below, their traffic stop of Dickson on August 8, 2020, Wong's search of Dickson and placement of Dickson in the back of a squad car, Majeski's brief search of Dickson's truck, and the overall duration of the stop were all reasonable under the Fourth Amendment.

### i.    Wong and Majeski had probable cause to pull Dickson over.

A traffic stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017) (quotation omitted). In other words, "[w]itnessing even a minor traffic violation gives an officer probable cause to stop the violator; any ulterior motivation on the officer's part is irrelevant." *Lockhart v. Siloam Springs*, 113 F.4th 844, 848 (8th Cir. 2024) (quotation omitted); *see also Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) (holding that an officer with probable cause for "even a very minor criminal offense" may arrest the offender). Minnesota law authorizes law enforcement officers to make arrests without

13

warrants when a public offense is committed in their presence. Minn. Stat. § 629.34, subd. 1(c)(1); *e.g.*, *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990). Where law enforcement is authorized to make an arrest, a lesser seizure is not transformed into a violation of the Fourth Amendment simply because law enforcement "did not go that far." *Rangel v. Satele*, No. 23-CV-2535 (ECT/SGE), 2025 WL 1179791, at *6 (D. Minn. Apr. 23, 2025).

Here, the traffic stop was justified because, as the body camera footage shows, Dickson's taillight was out. (Majeski BC 04:49-57.) Dickson later acknowledged his taillight was out, contrary to his assertion in the Complaint that "[a]t all times, [he] was following all traffic laws." (*Compare* Majeski BC 19:23-25, *and* 20:06-14, *with* Compl. ¶ 54.) Based on this traffic violation, Defendants Wong and Majeski had probable cause— i.e., authority—to stop Dickson. *De La Rosa*, 852 F.3d at 743; *Lockhart*, 113 F.4th at 848.

       ii.     *Dickson's detention and pat down were proper.*

Once stopped, Dickson admitted he did not have insurance, in violation of Minn. Stat. § 169.791 and contrary to the Complaint's assertion of lawful conduct. (Wong BC 05:40-05:48; Majeski BC 05:42-05:50; Compl. ¶ 54.) Therefore, Defendant Wong had probable cause to arrest Dickson. Minn. Stat. § 629.34, subd. 1(c)(1). Pursuant to such an arrest, Defendant Wong would have been authorized to place Dickson in handcuffs. *E.g.*, *Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012).

Wong did not arrest Dickson immediately upon learning that he did not have insurance or any documented ownership of the unregistered truck. Wong first conducted a limited pat-down search for concealed weapons, while explaining the purpose of the search to Dickson. (Wong BC 06:05-14; Majeski BC 06:07-16.) It is well established that an

officer may search an individual incident to arrest: "The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged." *Maryland v. King*, 569 U.S. 435, 449, 133 S. Ct. 1958, 1970–71, 186 L. Ed. 2d 1 (2013) (quotation omitted); *cf.*, *Rangel v. Satele*, No. 23-cv-2535 (ECT/SGE), 2025 WL 1179791, at *6 (D. Minn. Apr. 23, 2025) (probable cause sufficient for arrest is also sufficient for Fourth Amendment intrusions incident to arrest, even if the detention at issue does not conclude with a formal arrest).

Wong's search for concealed weapons was also permissible under *Terry*. An officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Here, the stop occurred late at night, during a period of significant unrest, and Dickson had been driving a vehicle without insurance, registration, proof of ownership, or fully operational taillights. *See*, *United States v. Cortez*, 449 U.S. 411, 412, 101 S. Ct. 690, 692, 66 L. Ed. 2d 621 (1981) (the objective inquiry requires that "the totality of the circumstances—the whole picture—must be taken into account").

After searching Dickson and after Dickson indicated that he would "freak out" if cuffed because he had "been harassed by the police before," Wong attempted to calm Dickson by inviting him to walk, unhandcuffed, to the squad car. (Wong BC 06:40-07:05.) Only after Dickson became increasingly agitated—despite repeated requests that he "stop"—did Defendant Wong push Dickson against the squad car and handcuff him to facilitate a brief detention. (Wong BC 07:05-30.)

As Wong made clear, this was not yet an arrest, but because Wong had probable cause to arrest Dickson, he was also authorized to handcuff Dickson and detain him in the squad car. *E.g.*, *Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012); *Rangel v. Satele*, No. 23-CV-2535 (ECT/SGE), 2025 WL 1179791, at *6 (D. Minn. Apr. 23, 2025) ("If it would not have violated the Fourth Amendment had [the law enforcement officer] arrested [plaintiff] and handcuffed him incident to the arrest, it is difficult to understand how [the law enforcement officer] violated the Fourth Amendment when he took the lesser step of briefly detaining and handcuffing [the plaintiff]"); *Ward v. City of Minneapolis*, No. 11-cv-1752 (JRT/LIB), 2013 WL 3871429, at *4 (D. Minn. July 26, 2013) (holding that an arrest and handcuffing were not an unreasonable seizure where law enforcement had probable cause due to minor criminal offenses).

While Dickson was detained, and after Dickson's ID was located, Wong checked Dickson's ID and his truck's VIN in law enforcement databases. (Wong BC 10:20-15:47.) As soon as that was done, Wong decided not to arrest Dickson and instead released him. (*Id.* at 15:47-16:16.) In total, Dickson was restrained for under nine minutes. (*Id.* 07:21-16:16). The brief duration of the detention was clearly reasonable in the circumstances. *E.g.*, *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (noting the Supreme Court has held "that a twenty-minute detention was reasonable when the police acted diligently and defendant contributed to the delay"); *Waters*, 921 F.3d at 737. Dickson's Fourth Amendment rights were not violated by Wong's pat down search, use of handcuffs, or short investigatory detention.

16

### iii.    The limited search of Dickson's truck was also proper.

During the approximately ten minutes that Dickson was outside his truck, Majeski searched the passenger area, driver's side, and engine compartment of the truck. (Majeski BC 07:19-12:49.) Majeski conducted this search on the understanding that Dickson had admitted to possessing a controlled substance. (Wong BC 16:34-44) (explaining to Dickson he thought he had heard him say he had "weed" in his front pocket). Based on this mistake of fact, Majeski would have had probable cause to search the vehicle for then understood admitted presence of controlled substances. *Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020) (noting that probable cause is "a practical and common-sensical standard," such that "an officer may draw inferences based on his own experience to determine whether probable cause exists.") Majeski also had objective probable cause to conduct a protective search of the truck for weapons prior to Dickson's return. *United States v. Stewart*, 631 F.3d 453, 459 (8th Cir. 2011) (determining a limited search of a vehicle for weapons was reasonable before releasing a suspect to that vehicle, even though no arrest was made). Further, a significant portion of Majeski's search of the truck appears to have been for the purpose of locating Dickson's ID, presumably to avoid unnecessarily extending the stop while the ID—as far as he was aware—was still missing. (Majeski BC 09:48-11:00.)

Although Majeski searched internal compartments in the truck's passenger area, he fully reassembled them after his search. (Majeski BC 07:54-8:12.) Because those enclosed areas would be accessible to Dickson when he returned to the truck, they were properly within the scope of Majeski's search. *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (citing *Michigan v. Long*, 463 U.S. 1032, 1052 (1983)). Neither Majeski's nor

17

Wong's body-worn cameras depict either as "throwing Dickson's family's belongings around the vehicle, tugging at upholstery, lifting up the rear seats . . . digging under the seats, throwing child car seats on the floor, tugging at the dashboard, rifling through consoles, taking a knife to pry out components of the dashboard and console, [and] attempting to dismantle the glove box" as alleged in the Complaint. (Compl. ¶ 60.)

Dickson admitted to having a knife, was unhelpful in identifying where it might be, and was subjected to a limited detention only while law enforcement conducted a protective sweep of the truck. (*See generally* Wong BC.) Dickson's agitation only further justified Wong's detention of Dickson to maintain the status quo of the stop while law enforcement searched for the knife and ran the VIN of a truck not equipped with a license plate or otherwise readily verifiable as Dickson's because he was driving without insurance. *Cf.*, *Saunders v. Thies*, 38 F.4th 701, 712-13 (8th Cir. 2022) (concluding that it is not unreasonable to extend a stop while conducting investigative tasks).

The traffic stop, use of handcuffs pursuant to a brief detention, and cursory search of Dickson's truck were each supported by probable cause. As such, Dickson has not plausibly pleaded a claim for unreasonable search and seizure under § 1983 against Hennepin Defendants and this claim should be dismissed.

B. Dickson's Claim for First Amendment Retaliation Fails.

Dickson also broadly concludes that Defendants' conduct amounted to retaliation against Dickson's protected exercise of his First Amendment rights. (Compl. ¶¶ 71-73.) Plaintiff again merely recites the elements of the claim while failing to identify specific conduct by any Defendant (or Plaintiff). (*Id.*)

18

The only allegation that is consistent with protected First Amendment activity is that Dickson "protested that he was being unreasonably and improperly detained."[4] (*Id.* at ¶ 58.) Dickson alleges that "Defendants only then escalated their rough treatment" in response. (*Id.*) The question at the heart of this retaliation claim is whether any portion of Wong's conduct was objectively motivated solely by a retaliatory animus—it was not.

"To state a First Amendment-retaliation claim under 42 U.S.C. § 1983, [Dickson] must allege that: (1) [he] engaged in a protected activity, (2) the government official[s] took adverse action against [him] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" *Minnesota State Coll. Student Ass'n, Inc. v. Cowles*, 620 F. Supp. 3d 835, 844 (D. Minn. 2022) (quoting *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016)); *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014); *Waters*, 921 F.3d at 741. "As to the third element, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Watson v. Boyd*, 119 F.4th 539, 550 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 280 (2025) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). "If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" *Aldridge v. City of St. Louis, Missouri*, 75 F.4th 895, 899 (8th Cir. 2023) (quoting *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022)); *Nieves*, 587

---

[4]   Majeski is not alleged to have had any physical contact with Dickson, let alone anything amounting to "rough treatment." Therefore, on the Hennepin Defendants' best understanding of Dickson's theory, no retaliation claim is raised against Majeski.

U.S. at 402 (A "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."). Even assuming for the purposes of this motion that Dickson has sufficiently pleaded the first and second elements, he cannot demonstrate a retaliatory motivation caused his claimed injury.

Dickson claims he was handcuffed and slammed into the side of a squad car in retaliation for protesting officer conduct. (Compl. ¶ 57.) However, Wong's body-worn camera footage shows Dickson was handcuffed only after becoming increasingly agitated and refusing to wait in the back of a squad car while law enforcement conducted a protective sweep of the truck and verified Dickson's information. (Wong BC 06:20-07:14.)

As discussed above, Wong's brief detention of Dickson was objectively supported by probable cause, not motivated by animus, and the Complaint does not otherwise identify how a similarly situated individual would have been treated differently. *Nieves*, 587 U.S. at 398 ("[T]he motive must *cause* the injury" such that "the adverse action against the plaintiff would not have been taken absent the retaliatory motive") (emphasis original); *Just v. City of St. Louis, Missouri*, 7 F.4th 761, 768 (8th Cir. 2021) ("Like a Fourth Amendment claim for a wrongful arrest, a First Amendment retaliatory arrest claim is defeated by a showing of probable cause (or arguable probable cause)."). Instead, Dickson claims only that he was protesting an "unreasonable and improper detention" and Defendants "escalated their rough treatment;" Dickson fails to identify any escalatory conduct where all conduct alleged was—as recorded—supported by probable cause and lawful authority. (Compl. ¶ 58; *see also*, Wong BC and Majeski BC.).

The Complaint and body-worn camera footage do not plausibly demonstrate that any aspect of Hennepin Defendants' conduct was motivated (i.e., solely, objectively, caused) by Dickson's protest of the same conduct. This claim should be dismissed. *E.g.*, *Just*, 7 F.4th at 768 (affirming judgment of dismissal on a claim of first amendment retaliation brought by an individual who was released without charges after being handcuffed and briefly detained in the back of a squad car.)

C. Dickson's Claim for Excessive Force Fails.

The four paragraphs containing Dickson's legal claim for use of excessive force differ in form from those containing his claim for unreasonable seizure only in the simple substitution of the words "excessive force" for "unreasonable search and seizure." (*Compare* Compl. ¶¶ 66-69 *with* Compl. ¶¶ 75-78.) The Complaint does not allege any specific injury. (Compl.) Although the pleading is unclear, the Complaint can be read as challenging only three of Wong's acts: handcuffing Dickson, pushing him against a squad car while handcuffing him, and placing him into the squad car.[5] (*See generally* Compl.)

Law enforcement officers "undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) (internal quotations omitted). "Handcuffing inevitably involves some use of force and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied." *Chambers v. Pennycook*, 641 F.3d 898, 907

---

[5]   Again, because Dickson alleges no physical contact with Majeski, the Hennepin Defendants understand this claim to be directed at Wong.

21

(8th Cir. 2011) (internal quotations and citation omitted). However, "a claim must be based upon more than 'a *de minimis* use of force.'" *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1210-11 (8th Cir. 2013) (quoting *Chambers*, 641 F.3d at 906); *see also Cavataio v. City of Bella Villa*, 570 F.3d 1015, 1018, 1020 (8th Cir. 2009) (finding an officer used *de minimis* force when he kneed a compliant, handcuffed, 75-year-old individual in the back while placing him in a patrol car).

When considering whether the use of force was *de minimis* "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used." *Chambers*, 641 F.3d at 906. Although not dispositive, a lack of physical injuries resulting from the use of force is evidence of the *de minimis* nature of the force used, particularly where no such injury is even alleged. *Waters*, 921 F.3d at 739-40. Indeed, the Eighth Circuit has found that law enforcement may handcuff and briefly place an unpredictably escalatory individual in a squad car to maintain the status quo and ensure safety while conducting an investigation, without violating the Fourth Amendment. *Id.* at 738. Dickson does not allege and the video does not show any injury, *de minimis* or otherwise, resulting from Wong cuffing Dickson and placing him in the squad car.

Wong's placement of Dickson in the squad car was well within the boundaries the Eighth Circuit has set for *de minimis* force. *E.g.*, *Cavataio*, 570 F.3d at 1020 (8th Cir. 2009) (determining that kneeing a compliant, handcuffed, senior citizen in the back while placing him in a patrol car is *de minimis* force). Because the August 2020 stop involved only a *de minimis* use of force, consistent with a seizure supported by probable cause, this claim should be dismissed. *See e.g.*, *Waters*, 921 F.3d at 739-40 (Affirming dismissal of a claim

22

which "failed to plausibly allege that [sergeant]'s use of force was objectively unreasonable, and . . . failed to plead the requisite resulting injury from the handcuffing."); *see also* First Am. Compl., *Waters v. Madson*, No. CV 17-935 (PAM/SER), 2017 WL 6403099 (D. Minn. Dec. 14, 2017), ECF No. 28, at ¶ 163 (alleging the plaintiff was "deliberately and unnecessarily handcuff[ed] . . . caus[ing] great pain"). In the conversation following the stop, Dickson never asked for medical attention, never mentioned any pain, and did not otherwise show any indication of physical harm. (Wong BC 16:16-22:26.)

Dickson's allegations do not support a use of force claim against Wong, and the claim should be dismissed. *E.g.*, *Waters*, 921 F.3d at 738-40.

As shown in the body worn camera footage of the incident on August 8, 2020,[6] Dickson was stopped for an unilluminated taillight and admitted to not having insurance; he was asked to step out of his truck, was briefly patted down, contradicted himself regarding the possible presence of a knife, and then handcuffed only after becoming increasingly agitated and refusing to calm down. (Wong BC 06:20-07:36.) The search and seizure here were supported by at least arguable probable cause, Dickson's detention was not the product of a retaliatory motive, and the use of handcuffs pursuant to a brief detention was not excessive force. Dickson has failed to state a plausible § 1983 claim against Hennepin Defendants, and these claims should be dismissed.

---

[6]    Dickson does not—and cannot—allege a single fact supporting the involvement of Hennepin County or either of the named Hennepin Defendants regarding events on November 12, 2019. (*See generally* Compl., at ¶¶ 26-51.) Accordingly, to the extent the Complaint might be construed as alleging any claims against any Hennepin Defendant arising out of the incident on November 12, 2019, those same claims are bereft of anything resembling a factual basis, and should be dismissed. (*See* Compl., at ¶¶ 3-6.)

**2.      Wong and Majeski Are Entitled to Qualified Immunity.**

Even if Dickson's claims against Wong and Majeski were not contradicted by the body worn camera footage, they are still insufficiently pled and should be dismissed. Further, because their conduct was supported by probable cause and did not violate any clearly established rights, Wong and Majeski are entitled to qualified immunity.

As the Supreme Court recently underscored, "[g]overnment officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at \*2 (U.S. Mar. 23, 2026) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (*per curiam*)); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Public officials are, therefore, "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 538 U.S. 48, 62–63 (2018) (internal quotation marks omitted). "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Nord v. Walsh Cnty.*, 757 F.3d 734, 738–39 (8th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Because neither Wong nor Majeski violated a clearly established right on August 8, 2020, Dickson's claims are barred by qualified immunity, and should be dismissed.

A.  Wong and Majeski did not violate Dickson's constitutional rights.

As detailed above, the Complaint does not plausibly articulate a right which was violated by Wong or Majeski in this case. To the contrary, Dickson was subjected to a lawful traffic stop for violating traffic laws. *E.g.*, *De La Rosa*, 852 F.3d at 743. Dickson was placed in handcuffs was well within the limits of Wong's lawful authority. *Atwater,* 532 U.S. at 354; *Royster*, 698 F.3d at 691. Wong and Majeski conducted a reasonably brief, precautionary search after Dickson indicated a knife might be present. *Morgan*, 729 F.3d at 1089–90. Wong's conduct was supported by probable cause, and therefore not retaliatory. *E.g.*, *Just*, 7 F.4th at 768. Wong and Majeski were not motivated by any retaliatory animus. *Nieves*, 587 U.S. at 398. And Dickson was not subjected to unreasonable force by Wong or Majeski. *Cavataio*, 570 F.3d at 1018, 1020.

B.  Wong and Majeski did not violate a clearly established right.

Even if Dickson's complaint could be understood as alleging the violation of a constitutional right—it cannot—his claims would still be barred by qualified immunity unless such a right was clearly established at the time. Neither Wong nor Majeski's conduct is of the sort placed "beyond debate" by Eighth Circuit precedent, and so Dickson's claims should be dismissed.

A right is clearly established "where an officer acting under similar circumstances was held to have violated the Constitution" and "[t]he relevant precedent [has] define[d] the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Zorn*, 2026 WL 795469, at *2 (internal quotations omitted). The precedent must be close enough to the circumstances

25

at issue to "have placed the statutory or constitutional question beyond debate.'" *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 79). Where the facts of a prior decision are "materially distinguishable" from the instant case, the prior decision is not "sufficiently similar" to defeat qualified immunity. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6–7 (2021) (per curiam). Put differently, "officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Zorn*, 2026 WL 795469, at *2 (cleaned up, internal quotations omitted).

The Supreme Court has never stated whether a right may be clearly established without a Supreme Court case specifically recognizing it. *Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022). Absent Supreme Court precedent, the Eighth Circuit has identified three additional ways by which a plaintiff can show the law is clearly established. First, "[a plaintiff] may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation." *L.G. through M.G. v. Columbia Pub. Sch.*, 990 F.3d 1145, 1147 (8th Cir. 2021). Second, "a plaintiff may point to 'a robust consensus of cases of persuasive authority' establishing that the facts of [plaintiff's] case make out a violation of clearly established right." *Id*. at 1147–48 (later elaborating that "[a] consensus based on "the decision of a single circuit and a handful of lower courts is not robust."). "Finally, a plaintiff may show, in rare instances, that a general constitutional rule applies with 'obvious clarity' to the facts at issue and carries the day for [plaintiff]." *Id*. at 1148.

"The principle at the heart of these approaches is that state actors are liable only for transgressing bright lines, not for making bad guesses in gray areas." *Id*. As such, "[q]ualified immunity 'protects all but the plainly incompetent or those who knowingly

26

violate the law.'" *Sok Kong ex rel. Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela*, 584 U.S. at 104), *Kong v. City of Burnsville*, 141 S. Ct. 2839 (2021) (Mem.), cert. denied sub nom.

No well-pleaded fact consistent with the body-worn camera footage demonstrates the violation of a constitutional right then-clearly established. In fact, Dickson's claims regarding the incident on August 8, 2020, track with conduct found *not* to be a constitutional violation in *Rangel v. Satele*, No. 23-CV-2535 (ECT/SGE), 2025 WL 1179791 (D. Minn. Apr. 23, 2025). In *Rangel*, Defendant Satele initiated a traffic stop with Plaintiff Rangel, ordered Rangel out of the truck (after Rangel asked if the stop was racially motivated), handcuffed him, and forced him to stand outside in wind chills colder than negative 35°F without arrest. *Id.* at *1. In that case, Judge Tostrud found that qualified immunity barred almost all of Rangel's claims, including unreasonable seizure, excessive force, and First-Amendment retaliation. *Id.* at *3.

Dickson does not present well-pleaded factual allegations or established precedent sufficient to place Wong and Majeski among "the plainly incompetent or those who knowingly violate the law," and the Complaint must be dismissed under the doctrine of qualified immunity. *Kisela*, 584 U.S. at 104.

**3.    Dickson's Derivative *Monell* and Civil Conspiracy Claims Are Improper.**

Dickson's remaining claims are all derivative of those discussed above and cannot stand alone. Even if they could survive without support from a viable claim of a constitutional violation—they cannot—Dickson has not alleged particular facts consistent with a well-pleaded claim of civil conspiracy, and Hennepin County is entitled to vicarious

27

official immunity regardless. Dickson's § 1983 "*Monell*" claim for municipal liability fairs no better; Dickson has not pleaded facts consistent with the alleged failure to "properly train, supervise and/or discipline" Wong or Majeski based solely on an isolated incident. The remaining claims are threadbare at best, appear to conflate the alleged conduct of the Minneapolis and Hennepin Defendants, and should not be entertained by this Court where they cannot stand alone.

A. The *Monell* Claim Fails.

Dickson asserts only that "Defendants City [of Minneapolis] and [Hennepin] County have failed to properly train, supervise and/or discipline Defendants Spies, Knoche, Pond, Wong, Majeski, Biederman, Partyka, Pearson, and Bauer." (Compl. ¶ 36; *see also* Compl. ¶ 86 (reciting the same vacuous legal conclusion.)) In addition to conflating the City of Minneapolis and Hennepin County, this conclusory assertion cannot support claim for municipal liability.

To apply municipal liability based on a failure to train and supervise under § 1983, a plaintiff must plausibly allege: (1) the municipality's training practices were inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those training practices such that the failure to train reflects a deliberate or conscious choice by the municipality; and (3) the inadequate training caused the plaintiff's constitutional deprivation. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). "Generally, an isolated incident . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

28

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted); *see also Ulrich,* 715 F.3d at 1061 (affirming dismissal of claim where plaintiff alleged inadequate supervision and training practices only supported by allegations concerning his own arrest and detention). However, the Supreme Court has left open the possibility, "however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

The Complaint fails to meet these requirements. It identifies no training or supervision practices that Hennepin County employed or failed to employ, no pattern of similar constitutional violations by untrained or unsupervised employees, and no facts suggesting a patently obvious constitutional violation that was caused by a failure to train or supervise employees. (*See generally* Compl.) If this inadequacy was not already fatal, the Complaint compounds its failure by omitting any identification of, or conduct by, a decision-making authority for either municipality. (*E.g.*, Compl. ¶¶ 79-82.)

Instead of particular factual allegations, Dickson offers one threadbare recital of the elements common to *Monell* claim. (Compl. ¶¶ 86-87.) Setting aside Dickson's refusal to distinguish between the Hennepin Defendants and Minneapolis Defendants,[7] Courts have

---

[7]   As before, to the extent Dickson claims Hennepin County should be held responsible for any alleged policy or failure to train concerning the Minneapolis Defendants, such claims would be inconsistent with the Complaint itself and otherwise divorced from reality. (*See*, *e.g.*, Compl. ¶¶ 9-19.)

found this kind of bare allegation insufficient under *Monell. See e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 898–99 (D. Minn. 2022) (dismissing, on Rule 12, a claim supported by "no specific facts pertaining to prior instances of a failure to train or discipline that would show [Defendant] had notice that its training and supervision were inadequate and likely to result in constitutional violations.").

Dickson's *Monell* theory of liability is an afterthought, not a valid claim. It should be dismissed.

B.  Dickson's Claim for Civil Conspiracy Fails.

Finally, Dickson's claim for "civil conspiracy" fails for a straightforward reason: he does not allege any communication at all—let alone an agreement—among the Defendants. This is the core element of any conspiracy claim, whether brought under federal statute or Minnesota common law. Of course, the Complaint does not indicate whether the conspiracy claim is made under state or federal law, but it fails regardless.

At a minimum, both §§ 1983 and 1985 require an underlying constitutional violation. *Wolk*, 107 F.4th at 860; *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). As discussed above, the Complaint does not plausibly allege such a violation. A claim of civil conspiracy under § 1983 or § 1985[8] also must be "allege[d] with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Torres v. City of St. Louis*, 39 F.4th 494, 506 (8th Cir. 2022) (citing *Kelly v. City of Omaha*,

---

[8]     Dickson's Complaint does not specify the legal basis for his claim.

813 F.3d 1070, 1077 (8th Cir. 2016)); *Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 860 (8th Cir. 2024) (holding a "conclusory allegation that defendants coordinated with one another . . . is insufficient to plausibly show the officers reached an agreement."); *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989) (noting a claim of civil conspiracy under 42 U.S.C. § 1985 "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.").

To the extent Dickson's claim is understood as a Minnesota Common Law conspiracy claim, the same principles apply because Minnesota law requires an underlying tort to support a civil conspiracy claim. *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. App. 1997); *see also Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 n.2 (Minn. 2014) (noting that a civil conspiracy claim is not independently actionable). No such tort is pled here. (*See generally* Compl.) Minnesota law also requires that a claim of civil conspiracy demonstrate "the minds of the alleged conspirators [met] upon a plan or purpose of action to achieve the contemplated result." *Bukowski v. Juranek*, 227 Minn. 313, 318, 35 N.W.2d 427, 429 (1948); *Steele v. Mengelkoch*, No. A07-1375, 2008 WL 2966529, at *2 (Minn. App. Aug. 5, 2008) (affirming the dismissal of a complaint where "the alleged facts [did] not establish a prima facie case of civil conspiracy," even under the State of Minnesota's notice pleading standard). Dickson raises no such allegation.

The Court should not assume unalleged facts, let alone construct a sweeping conspiracy claim where the Complaint does not even bother to allege that any Hennepin Defendant talked with any other Defendant at any point. *Cf. Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004) (even a pro se litigant would not be entitled to the court "assum[ing]

31

facts that are not alleged"); *see also Wolk*, 107 F.4th at 860 (mere allegations of coordination or collaboration among Defendants are insufficient to establish a conspiratorial "meeting of the minds."). Dickson's claim of implied conspiracy-in-gestalt is insufficient on its face and should be dismissed accordingly.[9]

    C.  Dickson's claim for Respondeat Superior and/or Vicarious Liability Claim fails.

Dickson additionally seeks the application of the doctrines of "respondeat superior/vicarious liability" to attach liability to Hennepin County (and the City of Minneapolis). However, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Additionally, "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, *Okl. v. Brown*, 520 U.S. 397, 403 (1997) (restating a holding articulated in *Monell*, 436 U.S. at 689).

The Complaint simply cannot support municipal liability against Hennepin County under § 1983, as discussed above, and Dickson's alternative theories of municipal liability should not be granted shelter in doctrines expressly rejected by *Monell* and its progeny. Dickson's claims against Hennepin County under the doctrines of *respondeat superior* and vicarious liability should be dismissed.

---

[9]    To the extent Dickson's conspiracy claim could be understood as a state common law claim, the district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction" 28 U.S. Code § 1367(c)(3). Further, Hennepin County is entitled to vicarious official immunity under State law where there is no indication that Wong or Majeski failed to perform a ministerial duty or otherwise acted willfully and maliciously. *E.g.*, *Aden as trustee for Est. of Aden v. City of Bloomington, Minnesota*, 128 F.4th 952, 960-61 (8th Cir. 2025).

**4.     Dickson does not have standing to pursue the injunctive relief he seeks.**

Dickson seeks injunctive relief "[p]rohibiting Defendants from engaging in profiling of Black men and requiring that Defendants institute training and policies to protect against continued profiling of Black men." (Compl. ¶ 17.) But the Complaint does not allege that Dickson will suffer future injury, so he does not have standing to seek such injunctive relief. *See e.g., Hoel v. Hennepin Cnty.*, No. 25-CV-3581 (ECT/DTS), 2026 WL 353320, at *4 (D. Minn. Feb. 9, 2026).

To have Article III standing to seek prospective relief, Dickson must demonstrate he is likely to suffer future injury resulting from the Hennepin Defendants' conduct, and that the sought-after relief will prevent that future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). "Allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

As "[t]he party invoking federal jurisdiction," Dickson "bears the burden of establishing standing." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation omitted). That is, Dickson's standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Dickson makes no effort to identify a certainly impending future injury or otherwise demonstrate how the requested relief might prevent it. (*See* Compl. ¶¶ 69, 74, 78, 84) (alleging only that Dickson "suffered permanent injury," and "will in the future suffer great

bodily and mental harm.") Therefore, the Court lacks subject-matter jurisdiction over Dickson's claims for forward-looking (and redundant) injunctive relief against Hennepin Defendants, and his claims seeking prospective injunctive relief should be dismissed.

## Conclusion

For the foregoing reasons, the Hennepin Defendants respectfully request that the Court grant their motion and dismiss Plaintiff Brandon Dickson's claims against them, with prejudice.

MARY F. MORIARTY
Hennepin County Attorney

Dated March 31, 2026

By: /s/ *Matthew Messerli*
Matthew L.R. Messerli (0403677)
(612) 348-0727
Matthew.Messerli@hennepin.us
Leaf McGregor (0389140)
Leaf.McGregor@hennepin.us
Assistant Hennepin County Attorneys
13-A Government Center, MC-137
300 South Sixth Street
Minneapolis, MN, 55416

*Attorneys for the Hennepin Defendants*

34