UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Brandon C. Dickson,

     Plaintiff,

v.

Jacob R. Spies, Richard L. Knoche, Kyle A. Pond, John K. Biederman, Aaron J. Pearson, Tony J. Partyka, Benjamin M. Bauer, individually, and in their official capacity as Minneapolis police officers; the City of Minneapolis; Jason Wong and Jason Majeski, individually and in their official capacity as Hennepin County Sheriff deputies; and Hennepin County,

     Defendants.

Case. No. 25-cv-4307-PAM/DTS

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS**

---

Plaintiff Brandon Dickson ("Dickson") respectfully submits this memorandum of law in opposition to the motion to dismiss filed by Hennepin County and its officers Jason Wong and Jason Majeski, ("Hennepin Defendants"), as well as the motion for judgment on the pleadings filed by the City of Minneapolis and Minneapolis officers Jacob R. Spies, Richard L. Knoche, Kyle A. Pond, John K. Biederman, Aaron J. Pearson, Tony J. Partyka, and Benjamin M. Bauer ("Minneapolis Defendants").

**INTRODUCTION**

This case confronts what everyone knows, and what has been extensively documented, which is that law enforcement in Minneapolis and Hennepin County

1

historically pull over Black men for routine, non-criminal traffic violations, more often than their white counterparts. And, frequently, there is no violation at all, making the stops wholly unjustified. When no serious violation of law is found during the stop, the Black man is then supposed to be happy to be released without charges, and relieved that nothing worse happened than the degradation of being treated unreasonably for being Black.

Defendants urge that while such practices may occur, they do not violate the constitutional proscriptions against unreasonable searches and seizures, and therefore they are not the Court's concern. Dickson, on the other hand, urges that the Court has an important role policing the limits of constitutional protections, and that the Court's role is even more important now, when the political branches openly flout those protections, such as by urging that the protection against warrantless searches of homes does not apply anymore.

While in some respects the 2020 stop initiated by Hennepin County deputies presents closer questions, the Complaint plausibly alleges that the 2019 and 2020 stops both violated Dickson's clearly established rights to be free from unreasonable search and seizure, and accordingly, Defendants' motions must be denied.

## FACTS

Despite Defendants' protests to the contrary, Dickson's detailed complaint adequately sets forth sufficient facts to give notice to Defendants of his plausible claims, and those facts are not meaningfully contradicted by the video footage

2

Defendants filed with the Court. Therefore, Dickson will not restate those facts in his memorandum, presuming that the Court has read the Complaint and will watch the video. As necessary for argument purposes, Dickson addresses some of Defendants' attempts to characterize the video to portray that which it does not portray, but failure to address every such factual portrayal in Defendants' combined 70 pages of briefing is not an admission that any such portrayal is accurate.

**LEGAL STANDARD**

For purposes of Defendants' motions, they adequately state the applicable legal standards. Though the motions are to dismiss and for judgment on the pleadings, respectively, the standards are the same.

**ARGUMENT**

Especially once all reasonable inferences are made in Dickson's favor, and the Court construes the Complaint favorably to Dickson, the Defendants' motions must be denied.

**I. Dickson adequately states plausible §1983 claims against the defendants.**

Defendants first argue that Dickson has failed to state § 1983 claims for which relief may be granted, but those arguments fail for three main reasons: (1) because they rely on a rendition of the facts which would require the Court to construe the Complaint against Dickson; (2) because they misstate the facts; and (3) because they misapply the law. Ultimately, because Dickson plausibly states

his § 1983 claims, with respect to the 2019 and 2020 incidents, the Defendants' motions must be denied.

## A. Dickson states plausible claims for unreasonable search and seizure.

In Count I of the Complaint, Dickson states claims that the Defendant officers subjected him to unreasonable search and seizure. Those claims must proceed on the merits.

### 1. Dickson states plausible claims for unreasonable search and seizure against the Hennepin officers.

The Hennepin Defendants assert that Dickson failed to state §1983 claims for unreasonable search and seizure because Majeski and Wong had probable cause to pull Dickson over and they did not improperly expand the scope of the stop. However, Majeski and Wong did not have probable cause or reasonable articulable suspicion to pull Dickson over, and even if they did, they unlawfully expanded the scope of the stop.

#### a. Wong and Majeski did not have probable cause to pull Dickson over, and their treatment of Dickson was unconstitutional.

Wong and Majeski portray the initial stop as one decidedly based on Wong and Majeski witnessing a traffic violation, but the video evidence does not show any such violation.[1]   Wong and Majeski first attempted to claim that they were

---

[1] While the Hennepin Defendants stress that ulterior motivation of the officer is irrelevant to whether the officer can stop a vehicle, the video evidence is clear that Wong and Majeski were not stopping Dickson for any reason other than to conduct an illegal search of the vehicle.

stopping Dickson for not having plates, but as they approached the vehicle, they saw that Dickson had his temporary paperwork displayed, having just purchased the vehicle two days before, and at that point, they shifted their purported reason for the stop to a taillight which was out.  However, it is only clear that one of the four rear lights was out, the upper light on the passenger side.  It is not a violation of law to have one of the two lights out, and therefore there was no valid basis for the stop.

Prior to stopping Dickson, Wong and Majeski were stationary looking for vehicles to stop.  Dickson drove by, made eye contact with them, and then they decided to make the stop. (Fussy Decl. at Ex. 5; 03:29-04:40; 11:53-12:09.) Immediately upon making the stop, purportedly for nothing more than lack of plates, the video suggests that Wong or Majeski summoned no less than five Minneapolis police officers to assist with an "unlicensed Tahoe."  (Id. at Ex. 5 04:40- 05:06).  Construed in favor of Dickson, the video evidence is consistent with Hennepin County and Minneapolis working jointly as part of some task force or initiative to pull over vehicles for the purpose of searching them, with or without probable cause.

Once Wong and Majeski approached the vehicle, they saw that the Tahoe was not unlicensed, and that it had, as Dickson described, the yellow, temporary permit posted.  (Id. at Ex. 5; 05:20-05:30.)  After Majeski acknowledges seeing that permit on the way to the vehicle, Wong states that there are taillights out too, shifting the purported basis he intended to use to fabricate a search of the vehicle.

5

(Id. at Ex. 5; 05:25-05:40.)  Dickson expressed disbelief, obviously not knowing he had any lights out.  (Id.)  Later, after acknowledging that one light was out, Dickson expressed that he thought he was being pulled over based on the plates, which Wong then falsely disavows, suggesting it was always about the lights. (Id. at Ex. 5;19:20-20:17.)   However, contrary to the claim that multiple lights were out, the video suggests that both driver side lights were working, and the lower passenger-side light was also working.  (Id. at Ex. 5; 09:41-09:44)

Setting aside for a moment why Wong and Majeski needed to summon multiple Minneapolis police squads over one missing taillight, it is not a violation of law for Dickson to have had just that one light out.  Section 169.57 of the Minnesota Statutes clearly establishes that a vehicle "must be equipped with at least two tail lamps mounted on the rear and on the same level" and that when "lighted, the tail lamps must comply with the provisions of this section."  Minn. Stat. § 169.50, subd. 1(b).   And that section only requires that vehicles "be equipped with at least one tail lamp, exhibiting a red light."   Minn. Stat. § 169.50, subd. 1(a).   In short, Minnesota law only requires one working light.  Dickson's vehicle was compliant.

Therefore, the entire stop was unreasonable, as Wong and Majeski had no basis for the stop.  *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017).  Dickson adequately pled a section 1983 claim for an unreasonable search and seizure.  At best for the County Defendants, they have created a factual dispute about whether the officers truly believed that the Tahoe was unlicensed, but by their own admission, even that was dispelled before they approached the vehicle.  And, the

6

fact-finder is free to disregard the claim that the officers believed the Tahoe was unlicensed, so at the pleading stage, that potential factual dispute is irrelevant.

### b. Even if Wong and Majeski had probable cause to pull Dickson over, their subsequent treatment of Dickson was unconstitutional.

Even if Minnesota law did not say what its says, and the Minnesota legislature intended for officers to pull over citizens because one out of three taillights were out, the stop was still unconstitutional.  Defendants unreasonably expanded the scope of the stop, escalating it into an unconstitutional search and seizure.

### i. Dickson's detention and pat down were improper.

Defendants stake the claim, citing to *Rangel v. Satele*, No. 23-CV-2535 (ECT/SGE), 2025 WL 1179791 at * 6 (D. Minn. April 23, 2025), that Wong and Majeski had a right to arrest Dickson, and therefore the lesser seizure of Dickson was permitted.  However, Wong and Majeski never had probable cause to arrest Dickson.  Even if the one burned-out taillight was a violation of law, it would be, at most, a petty misdemeanor, which is not a crime.  *See* Minn. Stat. § 169.89, subd. 1.  Defendants also cite to section 169.791, that Dickson did not have insurance, but that is also a petty misdemeanor.  *See* Minn. Stat. § 169.791, subd. 2.  That is, section 169.791 requires that a driver have possession of insurance, but there is no penalty otherwise tied to merely not having possession of proof.  Therefore, merely not having possession of proof is a petty misdemeanor.  *See* Minn. Stat. § 169.89, subd. 1.  There is an elevated misdemeanor penalty for refusing to

7

produce the proof "upon demand of a peace officer," but neither Wong nor Majeski ever demanded that Dickson produce proof. They merely inquired whether Dickson had insurance yet. (Fussy Decl. at Ex. 5, 05:44-05:58). Dickson handed over his identification and they demanded nothing else. Therefore, at most, Majeski and Wong envisioned two possible petty misdemeanors as the basis for the seizure and subsequent search.

Defendants cite to section 629.34, subd. 1(c)(1), of the Minnesota Statutes, for the proposition that Wong had probable cause to arrest Dickson for a public offense, but Minnesota law is clear that no officer can arrest for a petty misdemeanor, notwithstanding section 629.34. *State v. Carver*, 577 N.W.2d 245, 250 (Minn. App. 1998) ("the supreme court's overarching principle is clear and must be upheld by this court: an officer may not make a custodial arrest based only on a petty misdemeanor.") Accordingly, Defendants need to support their actions independent of any probable-cause-to-arrest theory. And they cannot.

The first main expansion of the stop occurred when Wong ordered Dickson from the car for the purpose of a protective frisk, which was both a search and a seizure. *United States v. Stewart*, 631 F.3d 453, 456 (8th Cir 2011). To that point, the exchange with Dickson had been calm, with the only alleged suspicion being of petty misdemeanor offenses. There was no indication Dickson was engaged in any unusual conduct which would lead Wong or Majeski to belief that Dickson was engaged in criminal conduct or posed any danger. *Id*.; *see also El-Ghazzawy v. Berthiaume*, 636 F.3rd 452, 457 (8th Cir. 2011).

8

Having decided not to demand insurance, and in the absence of any sign of threat from Dickson, Wong and Majeski could choose to do what they would do to a white man (let him go), or give a couple petty misdemeanor citations for Dickson to challenge. Instead, consistent with the theory that Defendants had other designs for Dickson, and with the Minneapolis police officer search party on the way, Wong elected to unreasonably escalate the stop by asking Dickson to step out of the vehicle and put his hands on the car. (Ex. 5 at 6:01-06:20). This was a necessary precursor to locking Dickson in the squad while searching his vehicle for unknown contraband, but it was not independently supported as a reasonable under the circumstances for Fourth Amendment purposes. Accordingly, Dickson has stated a plausible claim that the entire stop thereafter was unconstitutional. *El-Ghazzawy*, 636 F.3rd at 457 (stop on suspicion even of a non-dangerous *crime* is not a basis for suspicion of weapons) (emphasis added).

Even if the initial protective frisk could be deemed constitutional, the subsequent cuffing of Dickson was an unlawful expansion of the stop.

After Dickson complies and steps from the vehicle, Wong proceeds to conduct a pat down for weapons, asking Dickson if he carried any, to which Dickson responded "I don't carry weapons." (Id. at Ex. 5 at 06:15-06:20). At this point, nervous about why he is being taken from his car over at most a couple petty misdemeanors, and having been calm and compliant so far, Dickson, a carpenter, realized the possibility that perhaps he could have a carpenter's knife in his pocket, and he openly discloses the possibility. (Id. at Ex. 5: at 06:20-06:33). At this point,

9

as shown in the video, the first three-man team of Minneapolis officers arrives for the search:  Pearson, Biederman, and Bauer.  (See Fussy Decl. at Exs. 6, 7 and 8).  Bauer's video best captures the back-and-forth between Wong and Dickson, where Dickson is making it clear there is only a possibility of a work-related carpenter knife in his pocket, and in response to Wong asking where the possible carpenter knife is, they have the following exchange:

Dickson:  I said maybe.

Wong:  Where would it be?

Dickson:  In my pocket.  If you don't feel it, it ain't in there.

(Id. at Ex. 6; 06:24-06:37)  Wong then feels Dickson's pockets, and determines there is no knife, but instead of letting Dickson go at this point, he further escalated the situation by pulling out handcuffs to handcuff Dickson.[2]  (Id. at Ex. 5; 06:30-06:40)

At this point, coincidently, the rest of the Minneapolis police officer search team had arrived: officers Partyka and Alvarado.[3]  The five officers all standing around waiting for Dickson to be cuffed and placed in the squad so that they could start searching. And the moment that Dickson was put away, Wong, Majeski,

---

[2] Defendants suggest that Wong only produced the handcuffs after Dickson "was unable to provide an answer where the knife would be" but at best, that is making inferences against Dickson, who obviously had not stated for certain that he had a knife, but that as likely as it might be for a lawyer to have a pen in their pocket, it was always possible he might have had a carpenter knife in his pocket.  (See Hennepin Defendants Mem. at p. 6.)  That turned out to be not the case.

[3] Alvarado was not sued because he largely stood off to the side and did not participate.

Biederman, Partyka, and Bauer extensively searched Dickson's vehicle, as described in the Complaint. Only Alvarado and Pearson stood to the side. But it is unmistakable that the Minneapolis and Hennepin officers were acting according to a pre-ordained plan, where they were going to search Dickson's vehicle in hopes that this Black man would have some contraband to get off the streets. It was an unconstitutional shakedown, nothing more or less. Defendants banked on Dickson being happy, if nothing turned up, not to face any charges. Dickson was not happy.

By their conduct, Defendants activated Dickson's trauma from repeated negative interactions with police. When Wong pulled out the handcuffs and told Dickson he would be cuffed, Dickson became scared. Up to that point, he had been calmly compliant in every respect. George Floyd had been killed earlier that summer. Dickson had just been pulled over for petty traffic reasons. He was calmly complying with the officers, and teams of additional officers were inexplicably gathering around him as Wong and Majeski escalated the stop. (See Fussy Decl. at Ex. 5, 02:45-4:00.) As Dickson's anxiety rises, he protests being put into cuffs, explaining that he has done nothing wrong, and that being put in cuffs and in the back of a police car will cause him trauma. (Id.) Wong leads Dickson by the arm toward the squad, with Defendant Bauer initially grabbing Dickson's arm to keep him moving, and Wong does not relent in his quest to get Dickson in cuffs, again, all part of the plan. Wong repeatedly tells Dickson to stop complaining about being put in cuffs and into the back of the squad for no legitimate reason, and when Dickson continues to voice his opposition to the treatment he

was receiving, Wong further escalated the stop, slamming Dickson into the squad. (Id.; see also Ex. 6 at 07:07-07:10)  At no point was Dickson physically resisting the officers; his only objections were his words.  (Id.)

After Wong slams Dickson into the squad, three additional officers grab Dickson as Wong applies the handcuffs, with Biederman holding Dickson's left arm, Partyka holding his right arm, and Pearson pushing him up against the squad. (Id.; Ex. 7 at 07:20-07:35; Ex. 8 at 07:20-07:35; Ex. 9 at 07:20-07:35).

Under these circumstances, Dickson has properly pled a claim of unreasonable search and seizure of his person.  *See El-Ghazzawy v. Berthiaume*, 708 F. Supp.2d 874, 882 (D. Minn. 2010).  To determine whether the force utilized constitutes and arrest, the Court considers the following:

> (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*Id*.  Here, even assuming that Wong and Majeski were faced with a stop involving two petty misdemeanors, the use of handcuffs was more intrusive than necessary for an investigative stop.  First, Wong and Majeski were two of at least seven officers on the scene, with one Hennepin County squad and at least two

12

Minneapolis squads on the scene.[4]  The use of cuffs was gratuitous under the circumstances, only for the purpose of restraining Dickson while his vehicle was searched without justification.  Second, there was no reason to believe Dickson was armed following the pat down which did not even reveal any tools of Dickson's trade on his person.  Third, as discussed above, the theory in favor of the petty misdemeanors was weak and involved no crimes of violence.  Dickson should never have been stopped, and he should have been let go quickly.  Fourth, there was no need for immediate action.  Dickson had been calmy sitting in his vehicle complying with all requests.   The swarm of officers could have kept an eye on him while Wong confirmed, as he ultimately did, that the vehicle was clean.  Fifth, prior to asking Dickson to step from the car, and indeed leading up to Wong pulling out the cuffs, Dickson had been calm and evidenced no suspicious behavior.   If anything, he was overzealous in wanting to make sure the officers had no reason to do what he feared.

In sum, the escalation of the stop was more intrusive that necessary, converting it into an arrest. *See Id*.  The additional, subsequent interference with Dickson's liberty only compounds the violation of his constitutionally protected rights, but at minimum, the use of cuffs violated Dickson's rights and Dickson has stated a plausible claim.  The way the stop was conducted was not "reasonably

---

[4] Additional squads may have been at the scene.  While Majeski, Wong, Biederman, Pearson, Bauer, Partyka, and Alvarado were all still at the scene, a squad 612 is seen pulling away.  (Fussy Decl. at Ex. 8 at 14:35 to 15:10.)

related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

### ii.  The search of Dickson's Tahoe was improper.

Regardless of whether the search and seizure of Dickson was constitutional, the search of his vehicle was not.  The Hennepin Defendants make a variety of arguments to justify the search, but they all fail.

First, the Hennepin Defendants try to claim that Majeski conducted the search thinking that he heard Dickson say he had "weed" in his front pocket. (Hennepin Def. Mem at p. 17.)  However, Majeski does not ever actually state that he did the search because he thought he was looking for weed; he only made that claim after Dickson had been released from cuffs, as they discussed the conversation between Wong and Dickson about the carpenter's knife, which Majeski admits he could not really hear from across the car.  None of the video evidence included any comment by Majeski to any other officers about his purported mistake. Tellingly, no one ever searched Dickson's pockets for such weed, or found any, and the idea that Majeski was operating under the impression of the presence of admitted controlled substances, if he ever tried to adopt that claim himself, could be easily dismissed by the factfinder.  At the pleadings stage, Defendants' argument must be dismissed when the Complaint is read giving reasonable inferences to Dickson.

Second, the Hennepin Defendants try to make the case that "a significant portion of Majeski's search of the truck appears to have been for the purpose of

14

locating Dickson's ID," but even giving generous inferences to the Hennepin Defendants as opposed to Dickson as required, the video evidence primarily suggests a search with no mooring or purpose; it was just a wholesale search of the entire vehicle for unknown contraband.  All reasonable inferences in favor of Dickson suggest, moreover, that the search of the vehicle was the real purpose for the stop, as discussed above.

And both Wong and Majeski participated heavily in the search.  For Wong's part, immediately upon securing Dickson in the squad, Wong did not proceed to check the VIN or otherwise investigate the purported reasons for the stop.  Instead, he immediately went to the vehicle to join a search which was well underway. (Fussy Decl. at Ex. 5, 08:00-9:08.)    After observing Majeski digging in the front seat, Wong joins Biederman and Majeski to open the hood, tugging at interior components of the engine compartment before heading back to his squad.  In all Wong spends approximately a minute participating in the search, all before he realized that he did not know where Dickson's ID was.  Only after returning to his squad after participating in the search did he start looking for the ID.  The ID search took less than a minute, as Alvarado quickly disclosed that the ID was in the squad on the laptop. (Id. at Ex. 5, at 09:22-10:18.)

The actual search started even before Dickson was cuffed.  In addition to Wong's participation, and as described in the Complaint, Majeski, Biederman, Partyka and Bauer's participation can be summarized as follows:

15

Majeski started his search at 06:57, along with Biederman, starting in the front passenger seat.  After briefly leaving at 07:26, he returns at 07:39 to the front driver seat, again digging through the compartment, ripping out the center console, and then popping the hood for Wong and Biederman.  He then returns to see Partyka about to rip out the center console a second time, before checking the back seat, joining Biederman at 09:38 to at the engine compartment to comment that Dickson "acted like we would find something," before searching briefly for the ID with Wong starting at 09:58.  While Wong knew where the ID was as of 10:18, Majeski found another ID in Dickson's wallet at 10:45 and brought it to Wong at 11:00.  In all, this first search by Majeski, prior to looking for the ID at 09:58, spanned from approximately 06:57 to 09:58, over three minutes. Majeski did not go to check the VIN until 11:30 (See Ex. 10).  Majeski then returned at 12:00 to discuss the state of the search with Biederman.  They then continue searching the front, feeling around the compartment until he turns off his camera at 12:49.  (Id.)

Biederman started to search almost immediately upon arriving, starting in the back passenger seat at 07:03 before leaving to assist with putting Dickson in the squad.  (Fussy Decl. at Ex. 8.)  He then returns to the vehicle, opening the back gate at 7:45, digging through the contents behind the third row of seats before going to pop the hood at 08:33 and digging through the engine compartment until 09:37, commenting for the first time to anyone related to the search, other than his request to pop the hood, "Just because we didn't find it doesn't mean it ain't in there."  (Id.) Biederman then proceeds to the front passenger side, manipulating

16

the dash, searching the center compartment, and then becoming the third officer to rip out the center console, this time using his knife to pry it out.   Biederman continued his search of the front, including the glovebox, until 13:05, before moving on.   (Id.)   In total, Biederman spends over five minutes, from 7:45 to 13:05, searching the vehicle.

Partyka also joins the search almost immediately after helping put Dickson in the squad, for approximately two minutes, searching between 8:06 and 10:04, being the second officer to rip out the center console, as well as searching under the back seats.  (Fussy Decl. at Ex. 9.)

Finally, Bauer starts searching at 07:48, first the front, then the back, and under the back seats, before climbing into the third row of seats, until stopping his participation in the search at 10:25.  (Fussy Decl. at Ex. 6.)

The foregoing search, which explored well beyond the areas of the car to which Dickson would have had access while driving, went far beyond the "cursory search" described by the Hennepin Defendants, and both Wong and Majeski participated in the more invasive aspects of the search. Under these circumstances, Dickson has stated a plausible claim that the search of his vehicle was unconstitutionally expanded.

Indeed, giving all inferences in Dickson's favor, the search did not appear to be anything other than an open-ended search for contraband of any kind. Defendants were not looking for carpenter knife, or anything else associated with the petty misdemeanors they identified.

17

As an initial matter, if the initial stop was not justified, then the entire search was unconstitutional as it was not incident to a lawful investigatory stop. *Michigan v. Long*, 463 U.S. 1032, 1037 (1983). But even if the stop was valid, the scope of the search exceeded lawful bounds. As set forth above, the protective frisk, and cuffing of Dickson, were impermissible, unconstitutional acts, and the subsequent search of Dickson's vehicle, as the fruit of those unconstitutional searches, were also impermissible.

But if there were some basis for the search and seizure of Dickson, the search of his vehicle was an impermissible expansion of the search. Under established law, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons." *Stewart*, 631 F.3d at 457.

Under the circumstances here, Defendants possessed no reasonable belief that Dickson was dangerous and may gain immediate control of weapons. The *Michigan v. Long* exception to the prohibition against warrantless vehicle searches incident to arrest is a narrow one, limited to when the subject is dangerous or might gain immediate control of weapons. *Arizona v. Gant*, 556 U.S. 332, 346-347 (2009). As noted by the Supreme Court, a "rule which gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found

18

in the vehicle, creates a serious and recurring threat to the privacy of countless individuals." *Id.* at 345.  Absent such danger factor, with Dickson secured away from the vehicle, a search of Dickson's vehicle was expressly proscribed.  *Id.*

Here, Dickson expressly and honestly denied having any weapons, carving out only the possibility that a carpenter knife, a tool of his trade, could possibly be in a pocket, and it was not.  There was no reasonable suspicion of dangerous activity.  Indeed, as already stated, the circumstances most strongly suggest that Defendants stopped Dickson for the purpose of an unconstitutional stop, with no intention of requiring any justification for it.  Dickson was merely driving past the Twins stadium on a summer evening on the way home.

Unlike in *Stewart, e.g.*, Defendants observed no furtive movements or actions by Dickson suggestive of hiding a weapon or evidence of criminal activity in the vehicle.  Any attempt to cast his legitimate and well-articulated fear of being cuffed and put in a squad car, for at worst petty, non-criminal traffic infractions, as a basis for the search, is unreasonable.

Finally, to the extent that Defendants could still muster some reason to permissibly search Dickson's vehicle, the search was overly broad.   Defendants cite no case which would permit search of a trunk of a vehicle, or the engine compartment, as being part of the "passenger compartment," but Defendants searched not just the passenger compartment but under the hood and in the back.  They also dismantled the car, going beyond the passenger compartment and into the guts of the car, which are not part of the car where passengers reside.  Majeski

19

and Wong both participated in these searches outside the passenger compartment. Dickson has stated a plausible claim for an unconstitutional search of his vehicle.

### 2. Dickson states plausible claims for unreasonable search and seizure against the Minneapolis officers.

Dickson's claims against the Minneapolis officers relate both to the 2020 incident involving the Hennepin officers, and the 2019 incident involving officers Spies, Knoche, and Pond. Because Dickson states plausible claims against those the Minneapolis officers, the motion for judgment on the pleadings must be denied.

### a. Dickson states plausible claims for unreasonable search and seizure against Minneapolis officers Bauer, Pearson, Biederman and Partyka related to the 2020 incident.

While the Minneapolis officers' role in the 2020 incident was focused more on the search of Dickson's vehicle, and less on the seizure and search of his person, some of them participated in each.

With respect to the search and seizure of Dickson's person, when the Minneapolis officers arrived, Dickson was standing calmly beside his vehicle being frisked by Wong. Despite claims in the Minneapolis Defendants' briefing that Minneapolis officers heard a weapon was in the vehicle, those within earshot would have clearly heard the exchange with Wong, which made it clear that Dickson was only leaving open the possibility that a tool of his trade could be in one of his pockets, and they would have witnessed that no carpenter knife was in fact there. Nevertheless, without any reasonable articulable suspicion of any crime, or any

20

probable cause, Bauer, Biederman, Pearson and Partyka chose to involve themselves in placing Dickson into cuffs.  To his credit, Alvarado stayed aside. Bauer guided Dickson to go with Wong to get cuffed.  Pearson, Partyka, and Biderman all restrained Dickson while Wong placed him in cuffs.  For the reasons set forth above, that cuffing was a violation of Dickson's Fourth Amendment rights, and therefore Dickson states plausible claims against Bauer, Pearson, Partyka, and Biederman for their participation.

With respect to the search, Pearson and Alvarado did not participate, but Partyka, Biederman, and Bauer all extensively participated, as a search unit, to search a vehicle while Dickson was locked in a squad car. The Minneapolis officers had no knowledge or information to suggest that the search was tethered to any reasonable articulable suspicion or probable cause of any crime, or to any dangerous tendency of Dickson, or to any other exception to the warrant requirement.  Just like Wong and Majeski, they participated in searching beyond the passenger compartment of Dickson's vehicle, so in any event, Dickson states plausible claims against Partyka, Biederman, and Bauer for violation of his Fourth Amendment rights to be free from unreasonable searches of his vehicle.

### b. Dickson states plausible claims for unreasonable search and seize against Minneapolis officers Spies, Knoche and Pond related to the 2019 incident.

The Minneapolis Defendants assert that Dickson failed to state §1983 claims for unreasonable search and seizure because they had probable cause to pull him over and did not improperly expand the scope of the stop.  However, Spies and

21

Knoche did not in fact have probable cause or reasonable articulable suspicion to pull Dickson over.  Therefore, the stop was, from its inception, a violation of Dickson's Fourth Amendment rights, including the vehicle search pursuant to the stop, which was conducted by Knoche and Pond.

### i.  Dickson's 2019 detention was improper.

The Minneapolis Defendants claim that Dickson was tailgating Spies and Knoche, and that was the basis for pulling him over, in addition to darkly tinted windows.  The Minneapolis Defendants further allege that Dickson admitted to tailgating, but that claim is based on an overly generous treatment of the facts in favor of the Minneapolis defendants, which is not permitted in the context of a motion for judgment in the pleadings where all reasonable inferences are made in favor of Dickson.  Ultimately, the video evidence does not support that Spies and Knoche had any probable cause to stop Dickson.  Moreover, given the way they approached and treated Dickson, a factfinder will be able to easily disregard the claims of Spies and Knoche as purely pretextual.

Defendants filed three main forms of video evidence capturing aspects of the 2019 stop in the Walgreens parking lot.  None support that Spies and Knoche had probable cause to stop Dickson. The squad video[5] picks up showing Dickson signaling his left turn from the left-most driving lane, into the Walgreens parking lot, while the Knoche and Spies, in the right-most driving lane, then follow.  (Fussy

---

[5] The squad video does not have a time stamp on the screen like the body-cam footage, so the time references are to the elapsed time of the video.

22

Decl. at Ex. 1 at 0:00 to 0:40.)  By the time Knoche and Spies activate their light to seize Dickson, Dickson is slowly getting out of his vehicle to enter Walgreens.  (Id.)  As Dickson had done nothing wrong, he had no reason to believe there was any legitimate reason for the officers to be stopping him.  Spies first approached Dickson and told him to put his hands on the car, and within five seconds has repeated the demand three times while physically putting Dickson's hands on the car, and Dickson does not resist.  (Fussy Decl. at Ex. 2, 03:38:43-03:38:54.)  Dickson calmly explains he is going to get diapers.  (Id.)  Rather than de-escalate where it is clear Dickson is not resisting, Spies and Knoche immediately start escalating the situation with repeated commands, switching within seconds from demanding hands on the car to hands behind Dickson's back.  (Id. at Ex. 2, 03:38-55 to 03:39:10.)  These commands are repeated when Dickson in fact has his hands behind his back.  He is in cuffs within thirty seconds.  (Id. at Ex. 2, 03:39:18)

Despite having Dickson in cuffs, for close to two minutes after Dickson is placed in cuffs with his hands behind his back, Knoche presses his forearm against Dickson's neck.  (Id. at Ex. 1, 0:58 to 2:57).  As Dickson protests being stopped and profiled, Spies first claims that Dickson was tailgating, which Dickson does not admit to at any point.  (Id. at Ex. 2, 03:40:05, 03:40:30).  Cuffed with his hands behind his back, he is pushed into the squad car.  (Id. at ex. 2, 03:41:30-03:41:35.)  The rest of the interaction is as detailed in the Complaint.  As Spies taunts Dickson in the car, Knoche states that he is going to do a "quick weapons sweep."  (Id. at Ex. 2, 03:42:25 – 03:42:35.)  In response to Dickson's claim that there was no

23

reason to pull him over, Spies then invents a new list of purported reasons for the stop, none of which is established by the video evidence:  that Dickson failed to signal early enough, tint too dark, and a cracked windshield.  (Id. at Ex. 2, 03:42:35 - 03:43:30.)

Spies does not bring up the tailgating claim again for the rest of the stop, relying on tint issue, which he purports to document by measuring only the rear windows, which he acknowledges are properly tinted, falsely claiming that they are the same as the front windows.  (Id. at Ex. 2, 03:50:35-03:53:55.)  The video shows that the front windows have less tint.  (Id. at Ex. 2, 03:38:45-03:38-50; Ex. 4 at 03:44:00-03:44:15.)

Based on the allegations in the Complaint, which are not contradicted by the video evidence, Spies and Knoche had no basis for pulling over Dickson, and their attitude and rough treatment toward him suggests that they were motivated by racial animus.   With no basis for the stop, the entire interference with Dickson's liberty was unconstitutional.  *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).   Dickson rightly showed displeasure in vocalizing his distaste for being detained for no lawful reason.

### ii.  The search of Dickson's vehicle was improper.

Because there was no basis for the stop, there was no basis for a "weapons sweep" or other search of Dickson's car.  *Michigan v. Long*, 463 U.S. 1032, 1037 (1983).  Moreover, while Dickson voiced his displeasure with the stop, he had no weapons and displayed no other indicia of being a threat to the officers.  Contrary

24

to the Minneapolis Defendants' claims, Dickson was not "tensing" or resisting in any physical way; Spies and Knoch were simply roughing him up and pushing him around as a blatant abuse of their power, especially considering that for the majority of the encounter, Dickson was tightly cuffed behind his back.

Moreover, even if the stop were justified, Dickson was detained in the back of the squad, and therefore there was no basis for a search except if Dickson objectively presented as a danger, and he did not. *Arizona v. Gant*, 556 U.S. 332, 346-347 (2009). Nevertheless, Knoche and newly arriving officer Pond searched Dickson's vehicle, and in doing so, dismantled the interior, expanding the search beyond the passenger compartment by tearing away the boundary of the passenger compartment. Knoche and Pond were not looking for weapons or anything of the sort; as with the search in 2020, they were just on an open-ended search for contraband, untethered to any cognizable fear of harm, and without any indication that they might recover evidence of the petty traffic violations they falsely claimed Dickson committed. (See Fussy Decl. at Ex. 3, 03:42:57-03:48:51; and Ex. 4, 03:44:10-03:45:20.)

## B. Dickson states plausible claims for First Amendment retaliation against the defendants.

Dickson also brings §1983 claims against the defendant officers, because in each case, Dickson's protests regarding his treatment were met with escalating mistreatment by the defendants. In some respects alternative to the unreasonable

25

search and seizure claims, Dickson has plausibly pled facts to support these claims, and the motions to dismiss them should be denied.

### 1. Dickson states plausible claims for First Amendment retaliation against the Hennepin officers.

The County properly sets forth the standard for stating a First-Amendment retaliation claim. (See Def. Mem. at p. 19). Dickson must show (1) he engaged in protected activity, (2) adverse action was taken which would chill an ordinary person; and (3) the adverse action was motivated by the protected activity. *Minnesota State Coll. Student Ass'n, Inc. v. Cowles*, 620 F. Supp.3d 835, 944 (D. Minn. 2022).[6] For purposes of their motion, the Hennepin Defendants do not take issue with the first two prongs, but focus on the third prong, arguing that if Wong's response to Dickson protesting being put in cuffs and detained in the squad for no lawful reason – including slamming him against the squad – was based on his understanding of his of official duties, that there is no retaliation. (Def. Mem. at p. 19). Essentially, Defendants argue that as long as there was probable cause for Dickson's arrest, his detention was acceptable regardless of alleged animus.

Notably, cases cited by Defendants, like *Aldrige v. City of St. Louis*, 75 F.4th 895, 899 (8th Cir. 2023) are summary judgment cases where the Court would properly weigh the evidence. In this case, Dickson is cognizant that his claim is that Wong was going to cuff him regardless of whether he protested being

---

[6] The Hennepin Defendants properly observe that the rough treatment of Dickson was at the hands of Wong and the Minneapolis police officers, not Majeski. Except to the extent Majeski is liable under a civil conspiracy claim, the claim is not against Majeski.

26

mistreated, as that was one of the objectives of the operation.  However, Wong also appeared visibly upset that Dickson was protesting his unfair treatment. Dickson was not physically resisting in any way. Rather, he was verbally protesting, and Wong repeatedly told Dickson to stop verbally protesting, and then slammed him against the squad, telling him to stop.  This is more than a mere temporal connection between the protected conduct and the chilling action; physically slamming someone against a vehicle to get them to stop talking is evidence of retaliatory animus for the speech.  *Id.* at 900.  At the pleading stages, Dickson has alleged enough against Wong in this regard.

Second, alternative claims are allowed.  After discovery, if it appears that Defendants would not have cuffed or otherwise detained Dickson but for his verbal protests, a factfinder could find that the physical interventions of Wong, Bauer, Biederman, Pearson and Partyka, including putting him in cuffs, were because of Dickson's verbal protests.  It is premature to find that Dickson has not adequately pled a First Amendment retaliation claim.  As set forth above, Dickson has pled the absence of probable cause for his arrest, or even arguable probable cause.

### 2. Dickson states plausible claims for First Amendment retaliation against the Minneapolis officers.

In addition to the alternative First Amendment Retaliation claims against Bauer, Biederman, Pearson and Partyka in relation to the 2020 incident (alternative to their physical interventions being in furtherance of a violation of Dickson's Fourth Amendment rights), Dickson makes the same alternative claims

27

against Knoche and Spies with respect to the 2019 incident. Knoche and Spies had no probable cause nor reasonable articulable suspicion to stop Dickson, despite their false claims to the contrary, which are not supported by the video evidence once it is viewed in a favorable light toward Dickson. At the pleading stages, Dickson had adequately pled, in particular given how Knoche and Spies vociferously and violently responded to Dickson, that had he not voiced his opposition to their unlawful acts, he would not have been treated as roughly. Again, despite the Minneapolis Defendants' claims of physical resistance, the video footage is consistent with Dickson only verbally protesting his treatment, and all physical pressure being applied by Spies and Knoche. For these reasons, at this stage of the proceedings, dismissal of the First Amendment claims is premature.

## C. Dickson states plausible claims for excessive force against the defendants.

Defendants' arguments against Dickson's excessive force claims primarily originate from the assumption that Defendants had probable cause to arrest Dickson, and therefore, the force used to seize and search Dickson was reasonable. However, because none of the Defendant officers had cause to arrest him, their force was necessarily excessive. Moreover, even if Defendants had the right to cuff and detain Dickson, Dickson has alleged sufficient facts at this stage for his excessive force claims to stand. The motions to dismiss these claims must be denied.

**1. Dickson states plausible claims for excessive force against the Hennepin officers.**

With respect to the 2020 incident, the video evidence shows that it was Wong, in conjunction with Biederman, Pearson, Bauer and Partyka, who applied force to Dickson, but that force was in furtherance of the objective which all participating parties shared, including Majeski, of detaining Dickson without cause for the purpose of searching his vehicle.  Therefore, unlike the First Amendment retaliation claims, this claim is proper against both Wong and Majeski, as they acted in concert to seize Dickson by stopping him without cause, escalate that seizure to a search and seizure in the form of ordering Dickson from the car for a pat down, and then further escalating the stop when Wong applied the handcuffs and was assisted by Biederman, Pearson, Bauer and Partyka, including as he then pushed Dickson into the squad.  Because all that force was unwarranted, it was excessive.

The determination of whether force is excessive in any case is fact-specific and "use of force violates the Fourth Amendment when it is objectively unreasonable." *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011).  While a *de minimis* use of force is insufficient to state a claim for excessive force, the use of cuffs is more than a *de minimis* use of force.  *El-Ghazzawy*, 636 F.3d at 457. Because no amount of force was appropriate given the circumstances surrounding Dickson's 2019 stop, he has adequately pled an excessive force claim.  Moreover, even if the Hennepin Defendants had some cause to apply some force to Dickson,

29

he has still adequately pled a claim, as defendants have long been on notice that "some plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people."   *Chambers*, 641 F.3d at 906. Dickson openly and clearly illustrated that he is traumatized by being put in handcuffs and in the back of squads, given his past treatment by law enforcement, and under the circumstances, when defendants were ostensibly addressing low level traffic offenses, opting to apply cuffs was excessive.  Further, it was excessive for Wong to slam Dickson into the squad when he was not physically resisting, and for Dickson to be held by four officers at a time without reason.  As a result, Dickson suffered significant injury, including emotional trauma.

The Hennepin Defendants make much of the fact that upon being released, Dickson tried to engage Majeski and Wong in understanding his fears, and how he works to try to avoid having to confront them, and that the exchange after the cuffs were removed was cordial for the most part.  But the Hennepin Defendants should not confuse the relief that Dickson felt after he was released from the squad and the cuffs – that he was not going to endure a worse outcome – with lack of real injury.  Sure, it may be objectively true that Wong and Majeski were "nicer" than Spies and Knoche, but that does not diminish the harm that they caused to Dickson, through a completely unjustified interference with his liberty. At the pleading stages, Dickson has plead a plausible excessive force claim.

30

### 2. Dickson states plausible claims for excessive force against the Minneapolis officers.

With respect to the 2020 incident, Biederman, Bauer, Pearson, and Partyka's participation in the application of force orchestrated by Wong makes them jointly liable to the extent that was an excessive use of force.

With respect to the 2019 incident, for the same reasons that no amount of force was reasonable, and considering Spies and Knoche applied overly tight cuffs, and with Knoche applying his forearm to Dickson's neck for almost 2 minutes, all while Dickson was cuffed, the force was objectively unreasonable. The Minneapolis Defendants seek to portray Dickson as resisting, which could require greater use of force, but the video evidence at most creates a dispute of fact as to why Spies and Knoche were pushing so hard on Dickson. As alleged in the Complaint, Spies and Knoche's repeated claims that Dickson was "tensing" is consistent with an established practice and tendency within the department of using force on those who are not resisting and threatening to take them to the ground when they are not resisting, as Knoche and Spies did. (See Complaint at ¶ 37.[7]) Under these circumstances, Dickson has plausibly alleged excessive force by Spies and Knoche.

## II. The Defendant officers are not entitled to qualified immunity.

The caselaw which establishes that Dickson has plausibly stated his claims against Defendants is all well-established case law, and Defendants have always

---

[7] https://www.justice.gov/d9/2023-06/minneapolis_findings_report.pdf

been on notice that they are not entitled to use any force when they have no cause to stop a person.  Therefore, especially at the pleading stages, the defendant officers are not entitled to qualified immunity.

### A. The Hennepin officers are not entitled to qualified immunity.

The Hennepin Defendants' arguments in favor of qualified immunity primarily hinge on their arguments that Dickson has failed to allege any violation of his constitutional rights, as opposed to that Dickson has alleged unlawful conduct that was not clearly established to be unlawful at the time if occurred. Because Dickson has alleged violations of his clearly established rights, however, the Hennepin Defendants are not entitled to qualified immunity.  Thus, while the Hennepin Defendants properly cite to the two-prong test for qualified immunity, Dickson satisfies both prongs.

### 1.  Wong and Majeski violated Dickson's constitutional rights.

As established above, Dickson has plausibly alleged violations of his constitutional rights.  Dickson was subjected to a traffic stop when he had violated no traffic laws, and the Hennepin Defendants had no probable cause or reasonable articulable suspicion otherwise.  Therefore, the traffic stop, and all the force associated with it, was unreasonable and was unconstitutional. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

**2. Wong and Majeski violated Dickson's clearly established constitutional rights.**

The Hennepin officers knew that pulling over Dickson, and detaining him for the purpose of searching his vehicle for contraband, absent probable cause that there was contraband in the vehicle, or absent some other reasonable cause for the stop, coupled with objective indications that Dickson was a threat, would result in an unreasonable amount of force exposing them to an excessive force claim. *Chambers*, 641 F.3d at 898. And Defendants knew, as explained in *Gant*, 556 U.S. at 346-347, that the ability to search a detained person's vehicle is a narrow exception to the warrant requirement, yet they recklessly searched outside the passenger compartment without any indication that Dickson was a threat. Defendants assumed the risk that instead of being happy merely to not be subjected to more than an unconstitutional detention and search, Dickson would sue to enforce his rights. The Hennepin Defendants are not entitled to immunity.

**B. The Minneapolis officers are not entitled to qualified immunity.**

For substantially the same reasons that the Hennepin officers are not entitled to qualified immunity, the Minneapolis officers are also not entitled to qualified immunity. That is, the Minneapolis officers bank their claim to qualified immunity on the Court accepting a version of the facts which is favorable to them as opposed to Dickson, which is not the applicable standard on a motion for judgment on the pleadings. The video evidence supports that Dickson has

33

plausibly made claims against the Minneapolis officers, as explained above, all based on well-established precedent in existence long before 2019.

### III. Dickson's Civil Conspiracy and *Monell* claims are proper, and Defendants' motions are premature.

Dickson's Civil Conspiracy and *Monell* claims against the City have been plausibly pled.   Both types of claims are heavily reliant on documents and information which is more accessible to Defendants, and to deny the claims on a motion to dismiss deprives Dickson of the opportunity to develop them.   The motions to dismiss these claims should be denied.

### A. Dickson's civil conspiracy claims are adequately pled.

While the civil conspiracy claims are different for the 2019 and 2020 incidents, they have been plausibly pled at the pleading stage of the case. Defendants have fair notice of what Dickson seeks to prove.  For Dickson to prevail on a civil conspiracy claim, he must show (1) defendants conspired to deprive him of a constitutional right; (2) at least one of the co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act caused injury.  *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).  The first prong requires a meeting of the minds, which can be inferred from circumstantial evidence.  *White v. McKinley*, 519 F.3d 808, 816 (8th Cir 2008).  No express communications are necessary. *See Id.*

34

### 1. Dickson's civil conspiracy claims related to the 2020 Incident are adequately pled.

Dickson has adequately pled facts, consistent with the video evidence produced by defendants, that they conspired during the 2020 incident to stop Dickson and subject him to an unlawful search and seizure. Immediately upon stopping Dickson, the Hennepin Defendants radioed the Minneapolis Defendants, who showed up within minutes and started to gather at Dickson's vehicle as if they had a pre-existing plan or purpose to search the vehicle. Considering that two Hennepin officers only purported to see minor traffic violations, it does not make sense that they would be immediately radioed those Minneapolis officers unless there was a plan for them.

This plan, which can be inferred from the circumstances, makes even more sense given that Dickson was inexplicably ordered from his car without any suggestion that he was a threat, when he as calm and compliant, and then, once the search party arrived, Wong went to put Dickson into cuffs. Even without the benefit of discovery, to which Dickson will be entitled on this claim, he has alleged a plausible claim that the Hennepin Defendants and involved Minneapolis Defendants had conspired to deprive him of his constitutionally protected rights, and moreover, that such a conspiracy would not be something which those officers engaged in without authority from their superiors up the chain of command. The motions to dismiss the civil conspiracy claim with respect to the 2020 incident should be denied.

35

### 2. Defendant's civil conspiracy claims related to the 2019 incident are adequately pled.

Similarly, with respect to the civil conspiracy claims related to the 2019 incident, Dickson has alleged sufficient facts to show, based on how Knoche and Spies approached Dickson, that they were acting pursuant to Minneapolis policies and customs of unnecessarily escalating use of force against non-violent, and non-resisting persons like Dickson, to justify a different brand of shakedown from that employed in the 2020 incident. It can be inferred, from the circumstances, including Spies and Knoche's coordinated efforts, and use of code words like "tensing," leading to the goal of a search of Dickson's car, that they were cruising looking to search for contraband in predominantly Black neighborhood, by pulling over Black men like Dickson without regard for their constitutional rights.  In doing so, and in fact each taking discrete actions toward that goal, joined by Pone, they caused Dickson injury.  The motions to dismiss the civil conspiracy claims related to the 2019 incident should be denied.

## IV. Dickson's Monell claims are adequately pled.

Similar to his civil conspiracy claims, Dickson's *Monell* claims are plausibly pled at this stage of the litigation, where information further explaining the plausible allegations in particularly in Defendants' hands.  As identified by Defendants, a *Monell* claim holds the municipality liable if a violation stems from an official municipal policy or custom.  *Monell*, 436 U.S. at 694-95.  A local government can also be responsible for inadequate training.  *City of Canton v. Harris*, 489 U.S. 378,

388 (1989). Here, the circumstances of both the 2019 and 2020 incidents suggest that they were caused, in large part, by customs and policies which the City of Minneapolis and Hennepin County deliberately pursued, causing the injuries to Dickson.

### A. Dickson's *Monell* claims are adequately pled against Hennepin County.

Again, as with the civil conspiracy claim, the circumstances of the 2020 incident plausibly suggest that Wong and Majeski were not acting of their own accord, but according to training, custom, or plan, whereby all they had to do was radio the City of Minneapolis, and they were supplied with a bevy of officers ready to search a vehicle for contraband with little or no communication on the scene. The circumstances suggest that the involved officers were following a plan which was an approved practice, and which followed a basic pattern of a stop based on dubious grounds, which quickly escalates to handcuffs without any indication that the dubious grounds warrant the stop or cuffs, and placement of the suspect into a squad car while the arriving officers then search the vehicle for contraband. Such checkpoints are not legal in Minnesota, and they plainly violate Minnesotan Fourth Amendment rights, but evidently, and as alleged in the Complaint, Dickson was subjected to it. The Minneapolis Defendants and Hennepin Defendants were deliberately indifferent to Dickson's rights to be free from such policy or custom, and it caused Dickson harm. At this stage of the case, without the benefit of discovery, Dickson has plausibly pled this claim.

**B. Dickson's *Monell* claims are adequately pled against the City of Minneapolis.**

In addition to being implicated, in concert with the Hennepin Defendants, with respect to the 2020 incident, as described above, the Minneapolis Defendants are implicated, in connection with the 2019 incident, pursuant to a plausibly pled *Monell* claim.  As described with respect to the civil conspiracy claim, the actions of Spies and Knoche, joined by Pond, are suggestive of the officers carrying out a practiced and trained policing tactic which contains high risk of deliberate indifference to the rights of those stopped.  Dickson was harmed by this practice, and the claim should not be dismissed at this stage of the litigation.

## V. Dickson withdraws Count V of the Complaint.

Dickson withdraws, and does not opposed dismissal of, errantly included Count V.

## VI. Dickson has adequately pled facts to support his claim for injunctive relief at this stage of the litigation.

The Hennepin Defendants cite, among other cases, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-103 (1983), in opposition to one of the forms of equitable relief sought in Dickson's prayer for relief.  (See Complaint at p. 17, Prayer for Relief at D.)  To avoid unnecessary dispute over standing, and what quantum of proof would be necessary for Dickson to receive his requested injunctive relief, Dickson withdraws his requests for prospective injunctive relief.

38

## CONCLUSION

For the foregoing reasons, Dickson respectfully requests that Defendants' motions be denied, and that the case be decided on the merits.

**FERDINAND F. PETERS, ESQ. LAW FIRM**

Dated:  April 21, 2026

By:  ___s/ Benjamin Loetscher___
Benjamin Loetscher (#0389037)
711 Smith Ave. S.
St. Paul, MN  55107
Telephone:  (651) 647-6250
Fax:  (651) 560-7022
bloetscher@ferdlaw.com
**Attorneys for Plaintiff**