UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Brandon C. Dickson,

Plaintiff,

v.

Jacob R. Spies, Richard L. Knoche,
Kyle A. Pond, John K. Biederman,
Aaron J. Pearson, Tony J. Partyka,
and Benjamin M. Bauer, individually
and in their official capacity as
Minneapolis police officers; the City
of Minneapolis; Hennepin County;
and Jason Wong and Jason Majeski,
individually and in their official
capacity as Hennepin County
Sheriff deputies,

Defendants.

Civ. No. 25-4307 (PAM/DTS)


**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion to Dismiss and Motion for Judgment on the Pleadings.  (Docket Nos. 40, 50.)  For the following reasons, the Motions are granted.

**BACKGROUND**

Plaintiff Brandon Dickson brings this lawsuit against the City of Minneapolis, several Minneapolis police officers, Hennepin County, and two Hennepin County Sheriff's deputies related to traffic stops in 2019 and 2020.

**A.    2019 Incident**

On the evening of November 13, 2019, Dickson was driving in North Minneapolis. (Am. Compl. (Docket No. 11) ¶ 26.) He alleges that Defendant Minneapolis police officers Knoche and Spies "were on patrol . . . for the purpose of identifying Black men to stop without probable cause, reasonable articulable suspicion, or other lawful justification." (Id. ¶ 27.) Dickson was closely following their squad car. He subsequently turned into a Walgreens parking lot, and Spies and Knoche activated the squad car's lights and parked behind Dickson's vehicle. (Id. ¶ 30; Decl. of Tracey N. Fussy (Docket No. 62) Ex. 1 at 0:09-0:25.) Dickson exited his vehicle and began walking away. (Am Compl. ¶ 31; Fussy Decl. Ex. 1 at 0:28-0:35.)

Dickson did not comply with Spies's command to put his hands on his vehicle, so Spies approached Dickson, grabbed his arm, and walked him there. (Fussy Decl. Ex. 2 at 0:44-0:52.) Dickson also refused to comply with Spies's direction to put his hands behind his back. (Id. at 0:53-0:56.) Defendant Knoche then came to assist Spies, who was struggling to handcuff Dickson. (Id. Ex. 1 at 0:40-0:56.) Knoche ultimately put his forearm against the back of Dickson's neck and shoulder area, keeping Dickson's head away from Spies. (Id. at 0:57-02:53.) Dickson yelled that he was going to get his daughter some diapers, he has an active lawsuit against the police, and Defendants were choking him. (Id. Ex. 2 at 01:20-02:16.) Spies told Dickson that he was tailgating, to which Dickson replied, "Dude! You were going 10 miles per hour. I'm trying to make Walgreens before they close." (Id. Ex. 3 at 02:25-02:29.) As bystanders gathered, Knoche radioed

2

another squad.  (Id. at 02:34-02:37.)  As Dickson continued to scream and push, Defendants escorted Dickson to the squad car.  (Id. Ex. 2 at 03:02-03:31.)

Knoche performed a protective sweep of Dickson's vehicle.  (Id. Ex. 3 at 04:36-10:55.)  Defendant Hennepin County Sheriff's Deputy Pond responded to the call for backup and assisted Knoche with a portion of the vehicle sweep.  (Id. Ex. 4 at 03:43-05:32.) Spies began using his laptop to verify Dickson's information and then exited the squad car to observe and document the tint of Dickson's windows.  (Id. Ex. 2 at 6:00-15:11.)

Knoche then entered the squad car and began verifying Dickson's information on the squad car's laptop as Spies exited.  (Id. Ex. 3 at 11:54-17:31.)  He attempted to enter information into the computer, but was unable to do so, saying to himself, "Come on.  I'm not even in citations yet."  (Id. 17:30-31.)  Spies grabbed Dickson's wallet and driver's license, removed him from the squad car, took off his handcuffs, and released him.  (Id. Ex. 2 at 17:40-19:25.)  Dickson does not allege that he was given any citation and no charges were filed.  (Am. Compl. ¶ 50.)

**B.    2020 Incident**

Around midnight on August 8, 2020, two Hennepin County Sheriff's deputies, Defendants Wong and Majeski, were on patrol in downtown Minneapolis.  As with the November 2019 incident, Dickson claims that Wong and Majeski "were on patrol . . . for the purpose of identifying Black men to stop without probable cause, reasonable articulable suspicion, or other lawful justification."  (Id. ¶ 53.)

The upper right and center taillights of Dickson's vehicle were not illuminated, and the rear license plate was not visible.  (Fussy Decl. Ex. 10 at 01:18-01:26.)  So, Wong

3

activated the squad car's lights to initiate a traffic stop. (Id. Ex. 5 at 01:10-01:38.) Majeski approached Dickson's vehicle, asking for his license and insurance. (Id. Ex. 10 at 01:29-01:40.) Dickson produced his license but indicated that he did not have insurance for the vehicle. Wong informed Dickson that some taillights were out on his vehicle. (Id. Ex. 5 at 02:00-02:10.) Wong also inquired about insurance, and Dickson denied having insurance, the vehicle's title, or anything with the VIN on it. (Id. at 02:18-02:28.)

Dickson followed Wong's request to exit the vehicle for safety. (Id. at 02:38-02:44.) Dickson further complied with Wong's request to place his hands on his vehicle as Wong conducted a pat-down search and Majeski confirmed that there were no other occupants in the vehicle. (Id. at 02:45; id. Ex. 10 at 02:51-02:54.) When asked if he had any weapons, Dickson initially responded that he did not but later indicated that he might have had a carpenter's knife. (Id. Ex. 5 at 02:53-02:57.) Dickson could not say where the knife was, so Wong produced handcuffs. (Id. at 02:58-03:15.)

Dickson said that he would "freak out" if handcuffed, he had "done nothing wrong," and he had previous bad experiences with police. (Id. at 03:16-03:30; id. Ex. 10 at 03:15-03:30.) Dickson agreed to walk with Wong back to the squad car without handcuffs and Dickson reiterated that he did not want to be handcuffed or put in the back of the car. (Id. Ex. 5 at 03:30-03:51; id. Ex. 10 at 03:30-03:40.) Defendants then handcuffed Dickson, with the help of Defendant Minneapolis police officers Biederman, Bauer, and Partyka, who responded to Wong's call to assist with a Terry stop. (Id. Ex. 5 at 03:52-04:11.) When Dickson got into the backseat of the car, he exclaimed that his handcuffs were stuck on the seat, and Wong assisted Dickson in getting unstuck. (Id. at 04:15-04:25.)

Majeski began searching Dickson's vehicle, as did Biederman, Bauer, and Partyka. (Id. Ex. 10 at 04:05-07:17.)  Majeski believed that he heard Dickson say that he had "weed" in his pocket.  (Id. Ex. 5 at 13:04-13:16.)  Wong verified that Dickson's two IDs matched each other and checked the VIN for Dickson's vehicle.  (Id. Ex. 5 at 0:20-07:32, 07:39-12:09.)  The VIN search came back clear, so Majeski helped Dickson out of the squad car and removed the handcuffs.  (Id. at 12:20-12:47.)  Dickson stayed to speak with Wong and Majeski for a while, discussing topics such as violence in the area, Dickson's previous experiences with law enforcement, and Dickson admitted that his brake lights were out. (Id. at 12:47-18:51.)  Dickson does not allege that he was arrested, cited, or charged following this incident.

**C.      This Lawsuit**

This lawsuit followed.  Dickson brings claims for unreasonable search and seizure, First Amendment retaliation, and excessive force, pursuant to 42 U.S.C. § 1983.  He also raises allegations of civil conspiracy and a Monell claim.[1]

**DISCUSSION**

Hennepin County moves to dismiss the claims against it and the named Sheriff's deputies, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Likewise, the City of Minneapolis moves for a judgment on the pleadings under Fed. R. Civ. P. 12(c) to dismiss the claims against it and the named Minneapolis police officers.

---

[1]      Dickson withdrew his vicarious-liability claim and his request for prospective injunctive relief.  (Docket No. 75 at 38.)

The same standard governs a motion to dismiss for failure to state a claim under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c).  See Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009).  The Court must "view all facts pleaded by the nonmoving party as true and grant all reasonable inferences in favor of that party." Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008). When evaluating a motion for judgment on the pleadings "the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings."  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (quotations and citations omitted).

## A.    Qualified Immunity

Qualified immunity protects police officers from suit unless "their conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To evaluate whether an officer is entitled to qualified immunity, the Court must determine whether the facts alleged "make out a violation of a constitutional right."  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  The Court must also determine whether the right at issue was "clearly established" at the time of the alleged misconduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, a police officer is "entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right

was clearly established at the time of the violation." Capps v. Olson, 780 F.3d 879, 884 (8th Cir. 2015).

The Supreme Court has emphasized that the qualified-immunity inquiry should focus on whether there are any cases "where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [Constitution.]" White v. Pauly, 500 U.S. 73, 79 (2017). In other words, although there does not have to be a case "'directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). The legal question for the Court to answer is "whether the facts alleged by the plaintiff are a violation of clearly established law." Franklin for Estate of Franklin v. Peterson, 878 F.3d 631, 635 (8th Cir. 2017).

As explained more fully below, Dickson's claims are barred by qualified immunity, because he fails to demonstrate that the officers willfully violated his clearly established rights. No clearly established law would have put Defendants on notice that they could not initiate a traffic stop, handcuff Dickson, or search his vehicle. Moreover, his allegations are not consistent with body-camera footage.

**B.    Section 1983 Claims**

Dickson fails to plead that any specific conduct by Defendants was unreasonable, that any of his remarks led to retaliation by Defendants, or that he suffered any injury due to excessive force. Therefore, the Amended Complaint fails to plausibly allege any § 1983 claim.

### 1.    2019 Incident

#### a.    Fourth Amendment Claims

It is a traffic violation to "follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the conditions of the highway." Minn. Stat. § 169.18, subdiv. 8. It is undisputed that Dickson was closely following the squad car before Spies and Knoche initiated the traffic stop. Dickson conceded as much during the stop, commenting "Dude! You were going 10 miles per hour. I'm trying to make Walgreens before they close," and explaining that the squad car was in his way. (Fussy Decl. Ex. 3 at 02:25-02:29.) Thus, Knoche and Spies had at least reasonable suspicion that Dickson violated a traffic law and justifiably initiated the stop. Dickson's bald assertion that he followed all traffic laws is belied by his admissions on body-camera footage. Moreover, the officers had further reasonable suspicion due to their belief that the tint on Dickson's vehicle's windows was too dark under Minnesota law.

The subsequent search of Dickson's vehicle for weapons and his brief dentition in handcuffs were reasonable. It is undisputed that Dickson exited his vehicle and began walking away immediately after the officers initiated the traffic stop in the Walgreens parking lot. (Id. Ex. 1 at 0:09.) Body-camera footage shows that Dickson did not comply with Defendants' instructions to get back in the car or put his hands behind his back. (Id. Ex. 3 at 3:38:40.) Dickson also began yelling at the officers. In light of Dickson's conduct, officers had an objectively reasonable concern for their safety, and it was reasonable to use some degree of force to handcuff Dickson during the short duration of the traffic stop. Dickson fails to allege a Fourth Amendment claim related to this incident.

### b.    First Amendment Claim

Dickson next alleges that Defendants violated his First Amendment rights because they retaliated against him after he "spoke to the Defendants." (Am. Compl. ¶ 71.) "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 398 (2019) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." Id. (quoting Hartman, 547 U.S. at 256). Thus, to overcome qualified immunity, Dickson must show that Defendants lacked arguable reasonable suspicion to stop him. See id. at 402. As explained above, Defendants had at least reasonable suspicion to detain Dickson based on his traffic violation. Therefore, Dickson fails to state a retaliation claim.

### 2.  2020 Incident

### a.    Fourth Amendment Claims

Wong and Majeski had probable cause to pull Dickson over because they believed that a traffic violation occurred. Minnesota law requires that "[w]hen a vehicle is equipped with stop lamps or signal lamps, the lamps must be at all times maintained in good working condition." Minn. Stat. 169.65, subd. 3(a). "[A]n officer who observes a minor traffic violation can stop the vehicle even if the stop is a pretext for another investigation." United States v. Scott, Crim. No. 22-136 (PJS/BRT), 2022 WL 17345236, at *5 (D. Minn. Nov. 9, 2022) (Thorson, M.J.), report and recommendation adopted, Crim. No. 22-136, 2022 WL

17343386 (D. Minn. Nov. 30, 2022) (Schiltz, C.J.).  Video footage shows that Dickson's taillight was out, which he later admitted.  (Fussy Decl. Ex. 5 at 14:54-15:48.)

Further, once stopped, Dickson admitted that he did not have insurance, which violates Minnesota law.  See Minn. Stat. § 169.791, subd. 2.  Dickson was therefore subject to arrest, and the brief pat-down search was justified.  Thus, his claims for improper search and seizure fail.

Dickson's use-of-force claim also fails.  Dickson alleges that Wong used excess force to get him into the squad car.  Video of that interaction unequivocally demonstrates that the use of force was de minimus.  Moreover, law officers may use some physical force during a lawful seizure.  See Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011) (citing Graham v. Connor, 490 U.S. at 386, 396 (1989)) ("Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure . . . .").

Wong and Majeski's search of Dickson's vehicle was justified.  Dickson admitted that he may have had a carpenter knife but did not know where it was.  Majeski also believed that Dickson admitted to possessing marijuana, further warranting the search.  It was reasonable to conduct a brief search of Dickson's vehicle.

The City Defendants, who arrived mid-stop, can rely on Wong and Majeski's reasonable suspicion to stop Dickson.  See Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) ("Law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable.")  The City Defendants learned from Wong's call for backup that he and Majeski had stopped a vehicle without

10

license plates and the City Defendants arrived on the scene to see Dickson being removed from the vehicle and searched, while unable to confirm whether he had a weapon, and soon thereafter he grew agitated, was handcuffed, and began yelling. (Fussy Decl. Ex. 6 at 00:30-01:50.) Although Dickson's temporary license plate was visible once Dickson's vehicle was stopped and the officers approached it, that does not alter the constitutionality of the City Defendants reasonably relying on the information provided in Wong's call. Dickson fails to state a Fourth Amendment claim.

### b.      First Amendment Claim

As with Dickson's retaliatory arrest claim related to the 2019 stop, Dickson fails to plead a First Amendment retaliation claim related to the 2020 stop. Defendants had probable cause to arrest Dickson based on his lack of insurance at the 2020 stop; therefore, his First Amendment retaliatory arrest claim fails. Just v. City of St. Louis, Missouri, 7 F.4th 761, 768 (8th Cir. 2021).

### C.      Civil Conspiracy

Dickson alleges that Defendants conspired to violate his civil rights. To state a claim of civil conspiracy under § 1983, Dickson must allege that (1) Defendants conspired to deprive him of his constitutional rights; (2) at least one alleged co-conspirator engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). "In the absence of a [constitutional] violation, there is no actionable conspiracy claim." Torgerson v. Roberts Cnty. of S. Dakota, 139 F.4th 638, 646 (8th Cir. 2025) (quoting Cook v. Tadros, 312 F.3d 386, 388 (8th Cir. 2002)). Because Dickson has not plausibly pled that his constitutional rights were

11

violated or any co-conspirator engaged in an overt act in furtherance of the alleged conspiracy, his conspiracy claim fails as a matter of law.

**D.    Monell Claim**

Without a plausibly pled constitutional violation, there is no Monell liability. See Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or Monell . . . municipal liability."). The Monell claim thus fails.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that:**

1.    Defendant Hennepin County's Motion to Dismiss (Docket No. 40) and Defendant City of Minneapolis's Motion for Judgment on the Pleadings (Docket No. 50) are **GRANTED**; and

2.    This matter is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 8, 2026

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge

12